IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CRISTA EGGERS and NMM,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT EVNEN, Nebraska Secretary of State,<br><br>Defendant. | CASE NO. ____<br><br>**COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION** |

COMES NOW Plaintiffs Crista Eggers and NMM, and for their Complaint against Nebraska Secretary of State Robert Evnen, state and allege as follows:

## INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983 seeking to enjoin Secretary of State Robert Evnen from enforcing the unconstitutional multicounty signature distribution requirement of Article III, § 2 of the Nebraska Constitution. Under that provision, an individual seeking to place an initiative or referendum on the ballot must collect signatures in support of the measure from at least five percent of the registered voters in at least two-fifths of Nebraska's 93 counties.

2. Nebraska's counties vary widely in population. As a result, Nebraska's signature distribution requirement gives disproportionate influence to voters in sparsely populated counties. This dilutes the votes of residents in urban areas in violation of the Equal Protection Clause and Due Process Clause of the U.S. Constitution. It also restricts speech in violation of the First Amendment.

3. Plaintiff Crista Eggers (Eggers) is a registered and eligible voter in Omaha, Sarpy County, Nebraska. She has tried for years to qualify a ballot initiative and referendum de-penalizing the use and possession of medical cannabis. Eggers is committed to this issue because, among other reasons, her seven-year-old son

experiences severe epileptic seizures, which he has battled since the age of two. Eggers will continue her fight for ballot access until the issue of medical cannabis is presented to the voters of Nebraska.

4. Eggers is a paid contractor, volunteer and sponsor of NMM, which is commonly referred to as Nebraskans for Medical Marijuana. NMM is a ballot campaign committee registered with the State of Nebraska and an incorporated entity. In 2020, NMM's predecessor, Nebraskans for Medical Marijuana, collected and submitted over 196,000 signatures from Nebraska voters in support of an initiative to legalize medical cannabis. The issue was disqualified from the ballot following a decision from the Nebraska Supreme Court finding a violation of the single subject rule.

5. NMM recommitted its efforts in 2021, filing renewed paperwork with the Secretary of State for placement of two referendum petitions on the November 2022 ballot. For the past several months, NMM contractors and volunteers—including Eggers—have collected over 50,000 signatures from Nebraskans in support of the referendum petitions. Although NMM expects to collect the required number of signatures by the statutory deadline of July 7, 2022 on both referendum petitions to qualify for the 2022 ballot, it lacks sufficient resources to comply with the onerous and unconstitutional multicounty requirement of NEB. CONST. art. III § 2 ("multicounty requirement").

6. An immediate restraining order and injunction is required to ensure that ballot access in Nebraska complies with the fundamental protections enshrined in the U.S. Constitution. Without an injunction, ballot access and voting will be thwarted by the onerous and unconstitutional multicounty requirement.

7. Further, the remaining weeks of signature collection are critical for ensuring ballot eligibility. **In 2020, when the statutory deadline to submit petition signatures was July 2, 2020, Nebraskans for Medical Marijuana obtained over 123,000 signatures in June alone.** An immediate injunction is needed because Plaintiffs are entitled to collect signatures during this critical time without unconstitutional infringements.

8. Finally, expedited proceedings are necessary to ensure statutory compliance under Nebraska's election laws. Ballot sponsors are required to submit petition signatures to the Secretary of State at least four months before the general election. To qualify for the 2022 general election ballot, NMM must submit petition signatures by July 7, 2022. The Secretary then has a very limited amount of time to count the signatures and certify the referendum for the upcoming ballot. NEB. REV. STAT. § 32-801.

9. Given these time constraints, it would be futile for the Plaintiffs to wait until after the signatures are submitted and counted to seek injunctive relief. Further, resources in these campaigns are finite and the last month of signature collection in June is the most critical. Accordingly, Plaintiffs seek a declaration, an emergency injunction, costs and attorneys' fees.

**PARTIES**

10. NMM is a registered ballot question committee with the Nebraska Accountability and Disclosure Commission and an incorporated nonprofit corporation with the Nebraska Secretary of State. NMM has an interest in the subject matter of this suit and seeks to vindicate the First and Fourteenth Amendment rights of its members, sponsors and supporters.

11. Eggers is a resident of Sarpy County, Nebraska. She is a contract employee, volunteer and sponsor of NMM. Eggers' son has experienced epileptic seizures since he was two-years old. His physicians believe that cannabis could be an effective medical intervention to lessen his symptoms. However, his physicians are unable to make that recommendation under current law.

12. Eggers is a registered Republican and eligible voter of Sarpy County, Nebraska, and she has signed both medical cannabis petitions for the November 2022 ballot. She has, and will continue to, circulate petitions in support of medical cannabis referendums.

13. Defendant Bob Evnen is the elected and qualified Nebraska Secretary of State. Under the Nebraska Election Act, NEB. REV. STAT. § 32-101 to 32-1551, Secretary Evnen supervises the conduct of primary and general elections in

Nebraska. Secretary Evnen also performs and is responsible for certain duties related to the statewide initiative and referendum petition process, including oversight and implementation of requirements concerning the numbers of initiatives and referendum petition signatures necessary to be placed on the ballot for statewide and referendum petitions. Secretary Evnen enforces the multicounty requirement set forth in NEB. CONST. art. III § 2.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it involves a federal question under 42 U.S.C. § 1983.

15. Venue is proper pursuant to 28 U.S.C. § 1391 because Secretary Evnen resides in Nebraska and because the challenged conduct has occurred entirely within Nebraska.

## FACTUAL ALLEGATIONS

### A. 2020 Medical Cannabis Initiative.

16. In 2020, Nebraskans for Medical Marijuana drafted a proposed constitutional amendment to legalize medical cannabis. It submitted the proposed constitutional amendment to the Nebraska Secretary of State, along with a sworn statement, and began collecting signatures from various counties throughout the State ("2020 Ballot Initiative").

17. The 2020 Ballot Initiative garnered broad state-wide support. NMM recruited hundreds of volunteers and acquired nearly $2 million in financial support. Ultimately, NMM collected over 196,000 signatures from Nebraska voters in 48 counties throughout the state.

18. Organizers of the 2020 Ballot Initiative submitted the signatures they had obtained to the Nebraska Secretary of State. Upon review, the Secretary of State determined that NMM had garnered sufficient signatures and complied with all procedural requirements for placement on the 2020 ballot.

19. On August 26, 2020, Lancaster County Sheriff Terry Wagner filed an objection to the 2020 Ballot Initiative with the Nebraska Secretary of State.

20. Wagner's objection culminated in expedited litigation to the Nebraska Supreme Court. On September 10, 2020, the Nebraska Supreme Court determined that the 2020 Ballot Initiative violated the State's single subject rule. The Court issued a writ of mandamus directing the Secretary of State to withhold the 2020 Ballot Initiative from the November 2020 general election ballot. *State ex rel. Wagner v. Evnen*, 307 Neb. 142, 145, 948 N.W.2d 244, 250 (Neb. 2020).

21. In light of the Supreme Court's application of the single subject rule, NMM created two referendum petitions for circulation, making the geographic distribution requirement even more burdensome.

**B. 2022 Medical Cannabis Referendums.**

22. After the decision of the Nebraska Supreme Court, organizers and supporters of the 2020 Ballot Initiative recommitted their efforts to de-penalize medical cannabis.

23. In 2021, and per the Nebraska Supreme Court's ruling, NMM submitted to the Secretary of State the object and text of two separate, yet related referendum petitions. The requirement to submit two petitions necessarily requires NMM to collect double the number of signatures.

24. The first referendum petition submitted by NMM, titled the "Nebraska Medical Cannabis Patient Protection Act," generally removes penalties under state law for the use or possession of an allowable amount of cannabis for medical purposes by qualified patients ("Petition 1").

25. The second referendum petition, titled the "Medical Cannabis Regulation Act," generally removes penalties under state law for the possession, manufacture, distribution, delivery and dispensing of cannabis for medical purposes by registered private entities ("Petition 2").

26. NMM took all other required actions to obtain the petitions that are currently being used to collect the signatures needed to place Petition 1 and Petition

2 on the November 2022 general election ballot. These actions include, but are not limited to, submitting a list of sworn sponsors and communicating with Nebraska's Revisor of Statutes.

27. Since filing the proposed referendums with the Secretary of State, NMM has obtained over 50,000 signatures from Nebraska residents. NMM volunteers and paid contractors are actively collecting additional signatures, and NMM expects to obtain the required number of signatures (approximately 90,000 per referendum) before the statutory deadline for submission to the Secretary of State (July 7, 2022).

28. Prior experience shows that most petition signatures are obtained in the 30 days before the deadline for submitting petitions. **For example, NMM obtained approximately 63 percent of the required signatures, or 123,000 signatures, for the 2020 Ballot Initiative in June 2020 alone.** Plaintiffs expect to obtain at least that many signatures, or more, in the weeks preceding submission to the Secretary of State.

29. Plaintiff Eggers has and will continue to collect signatures as part of this effort. To date, Eggers has personally obtained approximately 1,500 signatures in connection with Petition 1 and Petition 2.

30. Plaintiffs have obtained bids from professional signature collection vendors, all of which exceed $1,000,000. To date, not a single ballot campaign has qualified for the ballot without paid circulators.

31. Due to the unexpected death of a financial contributor, Plaintiffs cannot afford to retain these professional vendors. Multiple quotes from professional vendors were significantly greater if the proposed plan required qualification of more than 25 counties.

32. Bids from professional vendors are higher as a result of the multicounty requirement because contractors charge by the signature. Increased compensation per signature is necessary to incentivize circulators to collect in rural counties where it is more difficult and time consuming to meet voters.

### C. Emergency Relief.

33. An emergency injunction is required here because, if the multicounty requirement is enforced, the people of Nebraska will not be able to express their will on the November 2022 general election ballot.

34. In other words, if NMM obtains the number of required signatures on Petitions 1 and 2, as expected, the multicounty requirement will still prevent qualification on the upcoming ballot.

35. Even if the NMM is unable to obtain the required signatures for Petitions 1 and 2, Plaintiffs Eggers and NMM expect to continue their efforts for ballot access in the future, as they have in the past. This includes the sponsorship of another initiative or referendum for the 2024 general election ballot.

36. The deadline for submitting petitions under Nebraska law is at least four months before the general election, or July 7, 2022. Plaintiffs will submit signatures to the Secretary of State on or before the deadline for doing so.

37. However, waiting until the deadline to file this lawsuit would be futile because, even after filing, the Secretary of State and local election officials need time to count and verify the signatures. By the time the signatures are counted, and a decision is made regarding ballot eligibility, Plaintiffs will have no time to file a lawsuit and seek injunctive relief to still qualify for the 2022 general election ballot.

38. In 2020, for example, NMM submitted its signatures to the Secretary of State on July 2, 2020. The Secretary of State issued a letter declaring his intent to certify the initiative for the general election ballot on August 27, 2020—just fifteen days before the statutory deadline. It would be futile to seek an injunction from this Court in such a compressed time schedule.

39. NMM is in a stronger position now with signature collection and possible qualification than it was in 2020. At this time in 2020, the campaign had fewer volunteers and a lower percentage of collected signatures.

40. Currently, Plaintiffs are actively strategizing and fundraising in advance of the July 7, 2022 deadline. NMM has approximately 350 volunteers collecting signatures for Petitions 1 and 2.

41. **Last week alone, NMM collected approximately 4,300 notarized signatures in support of Petitions 1 and 2.**

42. Deployment of limited resources in the next two months is critical and the geographic distribution requirement hinders NMM's ability to effectively plan and collect the requisite number of signatures. These efforts are thwarted by the current signature distribution requirement, which violates the U.S. Constitution.

43. For example, as of May 13, 2022, NMM had twenty-five volunteers committed to signature gathering the following day, May 14. Without the signature distribution requirement, NMM would deploy those volunteers in and around Lancaster and Douglas Counties for maximum signature gathering. With the signature requirement, however, NMM is forced to spend precious resources deploying the volunteers to rural areas. NMM must reimburse volunteers for these costs, which include food stipends and gas money.

44. In a four-hour shift in Douglas County, a volunteer gathers on average 400 signatures on Petitions 1 and 2. The same volunteer in Butler County working a four-hour shift collects on average 50 signatures on Petitions 1 and 2.

45. Further burdens exist when volunteers or potential paid staff seek to gather signatures in counties that have either already been qualified, or where qualification is not possible. In other words, NMM cannot expend resources or otherwise support individuals who seek to circulate petitions in counties that do not further the geographical requirements of Article III.

46. Plaintiffs are entitled to perform these functions and implement a targeted grassroots strategy without the unconstitutional burden that the multi-county signature distribution requirement imposes.

47. Relatedly, immediate relief is required for Plaintiff Eggers as a registered voter of Sarpy County. Once the deadline for submitting signatures comes and goes, without relief from the Court, the imminent injury to her voice dilution will occur and be irreparable.

**D. Geographic Considerations & Vote Dilution.**

48. NEB. CONST. art. III, § 2 requires that, for initiative petitions, "the registered voters signing such petition shall be so distributed as to include five percent of the registered voters of each of two-fifths of the counties of the state." NEB. CONST. art. III, § 3 requires that "[p]etitions invoking the referendum shall be signed by not less than five percent of the registered voters of the state, distributed as required for initiative petitions . . . ."

49. Nebraska has 93 counties.

50. The United States Census Bureau estimates that Nebraska's 2020 population was 1,923,826.

51. The Census Bureau's estimate of the population of Douglas County, Nebraska, as of July 2020, is 565,739. Based on this estimate, Douglas County is home to approximately 29.4 percent of the population of Nebraska.

52. Douglas County is adjacent to Sarpy County. Sarpy County's estimated 2020 population is 183,956 persons, or 9.5 percent of the State's population.

53. Dodge County is also contiguous with Douglas County. Dodge County's estimated 2020 population is 36,565, or 1.9 percent of the State's population.

54. Washington County is also contiguous with Douglas County. Washington County's estimated 2020 population is 20,546, or 1 percent of the State's population.

55. Saunders County is also contiguous with Douglas County. Saunders County's estimated 2020 population 21,356, or 1.1 percent of the State's population.

56. Of Nebraska's 93 counties, 47 percent of its 2020 estimated population lives in five counties – Douglas, Sarpy, Dodge, Washington and Saunders.

57. Approximately 64 percent of Nebraska's citizens live in the State's six most populous counties: Douglas, Sarpy, Saunders, Dodge, Washington and Lancaster.

58. As of 2020, 67 counties have populations under 10,000 persons each. Twelve Nebraska counties have estimated populations of fewer than 1,000 persons each.

59. Under the current multicounty requirement, 16 votes in Arthur County and 19 votes in Blaine County hold power equal to 6,464 votes in Sarpy County, 11,599 votes in Lancaster County, and 19,462 votes in Douglas County.

60. Thus, Eggers' vote as a Sarpy County resident equals about 1/404th of an Arthur County resident's vote.

61. The distance across Nebraska, measured by the travelling distance on Interstate 80, is 454.15 miles from the easternmost exit onto Interstate 90 in Douglas County, to the westernmost exit, exit 1, located .48 miles east of the Nebraska-Wyoming border at Pine Bluffs, Wyoming.

62. Measured by travel on US Highway 81 from Chester, Nebraska, on the Kansas border, to South Yankton, on the South Dakota border, the distance is 217.5 miles. The driving time from border to border within Nebraska from north to south is estimated at 3 hours 50 minutes, and at Interstate speeds the travel time from Pine Bluffs, Wyoming, exit to the western edge of Council Bluffs, Iowa, is estimated at 6 hours 30 minutes.

63. Given the geographic makeup of the state, the multicounty requirement can prevent an initiative or referendum petition from reaching the voters of Nebraska even if the sponsor successfully obtains signatures from fifty percent of all the voters in the contiguous counties of Douglas, Sarpy, Saunders, Dodge and Washington, where more than forty percent of the population of Nebraska resides.

64. Thus, it is possible to surpass the minimum numerical requirements of NEB. CONST. art. III, § 2 by 300% and still not qualify for placement on the general election ballot.

## FIRST CAUSE OF ACTION
**Violations of the Equal Protection Clause & Due Process Clause**
**42 U.S.C. § 1983**

65. Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

66. The multicounty requirement burdens Plaintiff Eggers' individual voice and vote as a petition circulator and, separately, registered voter of Sarpy County. It

also makes her signature and vote less meaningful than the signature and vote of other Nebraska residents in more sparsely populated counties.

67. The multicounty requirement violates the Equal Protection Clause because it increases the relative weight of the signatures of registered voters in rural counties while concurrently diluting the relative weight of the signatures of voters in the urban counties.

68. Plaintiff Eggers' vote is diluted because she lives in Sarpy County, which encompasses roughly 10% of Nebraska's total population. Because Eggers lives in a populous county, the signature of a voter in a rural county on an initiative petition is more valuable because it goes further in reaching the target of 5% of that county's registered voters.

69. This regime, in turn, creates a disparity in power between registered voters in rural counties and registered voters in urban counties in violation of the equal protection tenet of one person, one vote.

70. Because of this voting imbalance, voters in rural areas can act as gatekeepers who prevent otherwise valid initiatives from qualifying for placement on the ballot.

71. Where, as here, state laws treat ballot signatures unequally on the basis of geography, strict scrutiny applies.

72. The State has not, and cannot, put forward a justification for the multicounty requirement set forth in the Nebraska Constitution that satisfies rational basis review, much less strict scrutiny.

## SECOND CAUSE OF ACTION
**Violations of the First Amendment – 42 U.S.C. § 1983**

73. Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

74. The First Amendment is incorporated and made applicable to the states by the Fourteenth Amendment and prohibits state governments from enacting laws "abridging the freedom of speech."

75. The circulation, signing and submission of initiative and referendum petitions involves "core political speech," and is therefore protected by the First Amendment.

76. NMM and Eggers, in obtaining signatures needed to place referendum petitions on the 2022 ballot, are engaged in First Amendment activity that involves interactive communication seeking political and policy change.

77. The multicounty requirement places a severe burden on Plaintiffs' rights to engage in free political speech and to exercise petition rights because it dramatically compounds the complexity and cost of obtaining necessary signatures to put an issue on the state ballot, as set forth above.

78. The Secretary of State is responsible for enforcing this restriction.

79. As a proponent of Petitions 1 and 2, NMM and Eggers are injured by the multicounty signature requirement because it limits the number of voices who will convey Plaintiffs' message. As a result, NEB. CONST. art. III, § 2 limits the size of the audience Plaintiffs can reach and makes it less likely they will garner the number of signatures necessary to place the matter on the ballot.

80. In particular, the multicounty requirement forces circulators of the petition to discontinue collecting petition signatures in counties once the threshold had already been met despite the availability and willingness of volunteers and paid staff to continue collecting signatures in those counties.

81. Instead of continuing to collect petition signatures in counties once the threshold has been met, Plaintiffs must move to other counties to collect signatures to attempt to meet the multicounty requirement, quelling the political speech where Plaintiffs are already present.

82. Also, as described above, volunteers who would otherwise interact with and obtain signatures from large groups of people of urban areas are diverted to less populated areas where they obtain far fewer signatures, and reach a much smaller audience. This diversion not only costs NMM money, it restricts the entity's ability to spread its word and ideas, making it far less likely of qualifying for the ballot.

83. As a registered ballot question committee, NMM is harmed by the multicounty requirement because, to date, it has required NMM to allocate its limited resources across divergent counties, as opposed to investing in heavily populated counties with broad support. Even if Plaintiffs collected a number of signatures from Nebraska's two largest metroplex areas, Lincoln and Omaha, that far exceeded the minimum signature requirement, their efforts to put the issue before statewide voters would fail if they do not also meet the unconstitutional multicounty signature requirement.

84. The burden that the multicounty signature requirement places on Plaintiffs' right to advocate for political change and their core political speech is unconstitutional because the requirement cannot be justified by any legitimate State interest.

## **REQUEST FOR RELIEF**

Plaintiffs request this Court grant:

85. A declaration that NEB. CONST. art. III § 2's multicounty requirement violates the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution;

86. A preliminary and permanent injunction barring defendant from enforcing or threatening to enforce NEB. CONST. art. III § 2's multicounty requirement;

87. Plaintiffs' attorney fees and costs pursuant to 42 U.S.C. § 1988; and

88. Such other and further relief as the Court deems just.

DATED this 16th day of May, 2022.

                BY:    */s/ Mindy Rush Chipman*
                      Mindy Rush Chipman, #24499
                      Jane Seu, #27452
                      ACLU of Nebraska
                      134 S. 13st St. #1010
                      Lincoln, NE 68508
                      (402) 476-8091
                      mrushchipman@aclunebraska.org
                      jseu@aclunebraska.org

                      and

                      */s/ Daniel J. Gutman*
                      Daniel J. Gutman, #26039
                      Regina E. Schneider #22009
                      Law Office of Daniel Gutman
                      300 South 19th Street, Suite 312
                      Omaha, Nebraska 68102
                      (402) 319-8897
                      daniel@gutmanllc.com
                      ATTORNEYS FOR PLAINTIFFS