IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
NEBRASKA

| | |
|---|---|
| CRISTA EGGERS and NMM, | **CASE NO.  4:22-CV-3089** |
| Plaintiffs, | **REPLY BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION** |
| vs. | |
| ROBERT EVNEN, Nebraska Secretary of State, | |
| Defendant. | |

## INTRODUCTION

The Secretary's response fails to acknowledge decades of precedent protecting the ballot initiative process in Nebraska. The Secretary does not, for example, mention the "precious" right of initiative in Nebraska, which courts are "zealous" to preserve. *Hargesheimer v. Gale*, 294 Neb. 123, 134, 881 N.W.2d 589, 597 (2016). Nor does he cite governing cannons of construction, which require courts to liberally construe the power of initiative to promote the democratic process. *State ex rel. McNally v. Evnen*, 307 Neb. 103, 118, 948 N.W.2d 463, 476 (2020). And the Secretary ignores the requirement under Nebraska law that Article III be construed in a manner that effectuates the legislative power reserved in the people. *Id.*

Instead, the state official charged with protecting the initiative process in Nebraska advocates for its wholesale demise. (Filing 10 at 3). The Secretary suggests that the multicounty requirement is not severable from the rest of Article III, Section 2, and a finding that the multicounty requirement is unconstitutional requires eviscerating the entire ballot initiative process. In making this argument, the Secretary presents an all-or-nothing approach: either initiative sponsors comply with the unconstitutional multicounty requirement or have no access to the ballot at all. This is a remarkable argument from the Nebraska Secretary of State, who just two years ago acknowledged the initiative right as "fundamental to our state governance and is to be zealously protected." (Letter from Robert B. Evnen, Secretary of State, to Mark Fahleson, Rembolt Ludke et al. (April 27, 2020)).[1]

Although the Secretary asserts that severability is a threshold issue of Article III standing, he does not want an Article III judge deciding the issue—that would risk a timely decision. He wants the issue certified to the Nebraska Supreme Court. (Filing 12). By requesting certification, the Secretary seeks to delay the proceedings while the plaintiffs continue to suffer irreparable harm. If the Court were to grant this request—which it should not do—the Nebraska Supreme Court has sixty-days to determine whether to accept, or reject, the certified question. Neb. Rev. Stat. § 24-222. This would delay the proceedings in favor the Secretary, undermining a central purpose of the plaintiffs' request. Critical dates would come and go, leaving the plaintiffs without an efficient remedy.

---

[1] Available at: https://sos.nebraska.gov/sites/sos.nebraska.gov/files/doc/news-releases/Medical%20Cannabis%20Initiative%20Determination%20Letter%202020.pdf

The Court should reject the Secretary's attempts to delay and complicate the straightforward issues presented in this lawsuit. As discussed below, issues of severability should generally be addressed at the post-merits relief stage. And even if the Court reaches the issue of severability under the standing determination, the multicounty distribution requirement clearly passes the five-factor test established by the Nebraska Supreme Court in *Jaksha v. State*, 241 Neb. 106, 129, 486 N.W.2d 858, 873 (1992). The Secretary's procedural arguments are without merit, and the Court should reject them as a matter of law.

The Secretary is also wrong on the plaintiffs' likelihood of success on the merits. As to the plaintiffs' equal protection claim, the Secretary urges this Court to overlook the overwhelming state and federal court authority invalidating multicounty distribution requirements in favor of a single decision from the Massachusetts Supreme Judicial Court. (Filing 10 at 16). But as one federal appellate court has expressly stated, the Massachusetts case from last century is "wrongly decided." *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1079 n.7 (9th Cir. 2003). The Secretary has not, and cannot, provide a permissible justification for the multicounty distribution requirement, so it should be enjoined from enforcement in the upcoming general election.

The plaintiffs are also likely to succeed on their free speech claim. As discussed in the plaintiffs' opening brief and below, the multicounty distribution requirement forces campaign sponsors to deploy volunteers and paid staff away from urban areas to more sparsely-populated counties. It also requires sponsors and volunteers to

3

discontinue their electioneering efforts in rural counties as soon as they reach the arbitrary five-percent threshold, even if the campaign learns of opportunities to present their proposal where citizens would be supportive. (Eggers Declar., ¶¶ 18-19.) This result violates the First Amendment and should therefore be enjoined.

<u>**ARGUMENT**</u>

The Secretary's arguments proceed as follows: (1) the plaintiffs lack standing because the multicounty distribution requirement is not severable, and (2) regardless of severability, the plaintiffs are not likely to succeed on the merits. The plaintiffs address each of these arguments, in turn, below.

**I.  Plaintiffs have standing and the multicounty distribution requirement is severable.**

**A. Severability is a post-merits relief determination.**

Without strong arguments on the merits, the Secretary relies on procedure. His primary argument is that the plaintiffs lack standing because the multicounty distribution requirement "is not severable from the remainder of Article III, Section 2 of the Nebraska Constitution." (Filing 10 at 9). Because the provision "is not severable," the Secretary argues the absence of redressability—that is, a favorable judicial decision will not redress the plaintiffs' injuries because a favorable decision "will erase Nebraska's initiative right." (*Id*. at 10).

As a preliminary matter, the plaintiffs agree that the wholesale invalidation of Nebraska's ballot initiative process—as advocated for by the Secretary—would undermine the intention of this lawsuit. Crista Eggers has not spent the past several years of her life advocating for ballot access simply to have the process eliminated

4

altogether. **This would be a disastrous outcome for Crista personally, and the democratic process more generally.** Thus, to the extent the Court finds that the multicounty requirement is not severable from the rest of Article III, Section 2, the plaintiffs readily concede that redressability is not tenable.

But the Secretary's argument on the severability of the multicounty requirement is procedurally and substantively wrong, so the Court should reject it as a matter of law. The Nebraska Supreme Court has held that severability considerations are appropriate only *after* a final determination on the merits. *See State ex rel. Bruning v. Gale*, 284 Neb. 257, 277, 817 N.W.2d 768, 782 (2012) ("Our general rule provides that when part of an act is held unconstitutional, the remainder must likewise fail, unless the unconstitutional portion is severable from the remaining portions."). Thus, severability is generally a post-merits consideration, appropriate only after a finding that the challenged provision is in fact unconstitutional. *Id*.

Because the Court does not reach a final determination on a motion for preliminary injunction, severability considerations are generally premature at this early stage of the proceedings. For this reason, the Tenth Circuit Court of Appeals vacated a preliminary injunction order reaching the issue of severability because the matter "did not need to [be] determine[d] at this early stage" of the lawsuit. *Petrella v. Brownback*, 697 F.3d 1285, 1296 (10th Cir. 2012). Similarly, the Eleventh Circuit has held that severance is generally premature on a preliminary injunction motion

"because we will not invalidate—only preliminarily enjoin—the [challenged law]." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010).

As discussed below, however, there is one exception to this general rule: A severability determination *is* appropriate on a motion for preliminary injunction where, as here, the Court has "no problem" concluding that the challenged language "is severable" from the broader provision. *Id.*

### B. Even if the Court incorporates the severability analysis into the standing determination, the multicounty distribution requirement is clearly severable from Article III, Section 2.

The multicounty distribution requirement is clearly severable from Article III, Section 2 of the Nebraska Constitution. This result follows not only from Nebraska's presumption of severability, but also from a straightforward application of Nebraska's five-factor severability test. The Court should, therefore, emphatically reject the Secretary's invitation to upend and deprive the people of the initiative process in Nebraska.

### 1. Unconstitutional provisions are presumptively severable.

In Nebraska, "the presumption is in favor of severability." *State v. Monastero*, 228 Neb. 818, 839, 424 N.W.2d 837, 851 (1988). This presumption is rooted in principles of statutory construction. In *Ewing v. Scotts Bluff County Board of Equalization*, for example, the Nebraska Supreme Court cited the "cardinal principle" of statutory construction to "save and not destroy," and to "refrain from invalidating more of the statute than is necessary[.]" 227 Neb. 798, 808, 420 N.W.2d 685, 691 (1988) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S. Ct. 1476, 1479, 94 L. Ed. 2d 661 (1987)).

6

These "cardinal principles" are particularly important here, as the Secretary seeks to invalidate the most precious right conferred to the people of this State. Indeed, the Nebraska Supreme Court has repeatedly held that the right of initiative is "precious," and courts are to zealously protect it to the fullest extent of the law:

- ***State ex rel. McNally v. Evnen***: "The power of initiative must be liberally construed to **promote the democratic process**, and provisions authorizing the initiative should be construed in such a manner that the legislative power reserved in the people is effectual." 307 Neb. 103, 118, 948 N.W.2d 463, 476 (2020) (emphasis added).

- ***Hargesheimer v. Gale***: "We have stated that the power of initiative must be liberally construed to promote the democratic process, that the right of initiative is precious to the people and is one which the **courts are zealous to preserve** to the fullest tenable measure of spirit as well as letter, and that the provisions authorizing the initiative should be construed in such a manner that the legislative power reserved in the people is effectual." 294 Neb. 123, 134, 881 N.W.2d 589, 597 (2016) (emphasis added).

- ***State ex rel. Morris v. Marsh***: "The decisions almost universally hold that the power of initiative must be liberally construed to promote the democratic process and that the right of initiative constitutionally provided **should not be circumscribed** by restrictive legislation or narrow and strict interpretation of the statutes pertaining to its exercise." 183 Neb. 521, 531, 162 N.W.2d 262, 269 (1968) (emphasis added).

Nebraska's presumption of severability is also consistent with decades of U.S. Supreme Court precedent. Where, as here, a challenged scheme deprives one group of individuals of a particular right granted to them, the Constitution favors extending

7

the right to those excluded, rather than depriving everyone of it. *Califano v. Westcott*, 443 U.S. 76, 89, 99 S. Ct. 2655, 2663, 61 L. Ed. 2d 382 (1979). In other words, when faced with two remedial alternatives in an equal protection dispute, "**extension, rather than nullification, is the proper course**" so that complete suspension of the process does not impose "hardship" on those whom the process is "plainly meant to protect." *Id.* at 89–90. (emphasis added).

In sum, the multicounty distribution requirement is presumed severable under Nebraska law. This presumption is particularly important here because the Secretary's argument, if validated, would undermine—not promote—the democratic process in Nebraska. *State ex rel. McNally*, 307 Neb. at 118 ("power of initiative must be liberally construed to promote the democratic process"). The Court should emphatically reject the Secretary's attempt to nullify Nebraskans' right to initiative.

## 2. The challenged provision is severable under Nebraska's five-factor severability test.

With this strong presumption in mind, Nebraska courts consider five factors in determining whether an unconstitutional provision is severable from the remainder of the provision: (1) whether, absent the invalid portion, a workable plan remains; (2) whether the valid portions are independently enforceable; (3) whether the invalid portion was such an inducement to the valid parts that the valid parts would not have passed without the invalid part; (4) whether severance will do violence to the intent of the Legislature; and (5) whether a declaration of separability indicating that the Legislature would have enacted the bill absent the invalid portion is included in the act. *Jaksha*, 241 Neb. at 129, 486 N.W.2d at 873. Each of these

8

factors, considered separately or together, weighs in favor of severing the multicounty distribution requirement from Article III, Section 2 of the Nebraska Constitution.

### i.    The people's intent.

An important consideration in the severability analysis is whether the unconstitutional provision was an "inducement" to passage of the broader constitutional provision. *Id*. at 129. This factor is not about compromise—indeed, "compromise is an inherent part of the lawmaking process." *Big John's Billiards, Inc. v. State*, 288 Neb. 938, 952, 852 N.W.2d 727, 739 (2014). Rather, the inducement factor asks whether the authorizing authority—here, the voters—intended to pass the statutory or constitutional scheme at issue "only as it existed with the unconstitutional [provisions]." *Id*.

In determining the intent of voters (as opposed to the Legislature), the text of the ballot controls. In other words, "the intent of the voters adopting an initiative amendment to the Nebraska Constitution must be determined from the words of the initiative amendment itself." *Omaha Nat. Bank v. Spire*, 223 Neb. 209, 225, 389 N.W.2d 269, 279 (1986). Here, the language of the constitutional provision presented to voters in 1912 clearly and unequivocally demonstrates that the multicounty requirement is severable from the remainder of Article III.

**<u>Text of Ballot</u>**: After passing both chambers of the Nebraska Legislature, and per the requirement of Article XVI, § 1 of the 1875 Constitution (discussed below), the proposed initiative and referendum right was placed on the ballot for the 1912

general election. The measure passed overwhelmingly by a vote of 189,200 to 15,315. 62 CONG. REC. SEN. 4735 (daily ed. March 3, 1913) (XV. Nebraska, 1912).

As mentioned, the text of the ballot is the best and most conclusive indicator of voter intent. *Omaha Nat. Bank*, 223 Neb. at 225. Accordingly, it is the ballot itself— not the Secretary's unsupported conclusions[2]—that govern the severability analysis. And the 1912 ballot makes clear that the multicounty distribution requirement was neither "integral" nor "intertwined" with the initiative right because it is not referenced on the ballot at all:



---

[2] Most of the Secretary's arguments on this point are not supported by *any* citations to law or fact. The State argues, for example, that "there is every reason to believe that the voters, especially those living outside Nebraska's few large cities, would not have approved an initiative power without the multicounty signature requirement." (Filing 10 at 14). But it's not clear what those "reasons" are because the Secretary provides no explanation or citations.

(Gutman Decl., Ex D) ("FOR proposed amendment to the constitution reserving to the people the right of direct legislation through the initiative and referendum" or "AGAINST proposed amendment to the constitution reserving to the people the right of direct legislation through the initiative and referendum").

In sum, there is no evidence to support the Secretary's position that the voters in 1912 intended to pass the initiative right "only as it existed" with the multicounty signature distribution requirement. *Big John's Billiards, Inc.*, 288 Neb. at 952. In fact, every available record (and basic common sense) indicates that it was the power of initiative—not the multicounty distribution requirement—that was the motivating factor in the minds of voters. There is no merit to the State's inducement argument, and the Court should reject it as a matter of law.

**Historical Origins**: The broader historical and legislative origins of the initiative right also support a finding of severability. *Duggan*, 249 Neb. at 430–31 (historical facts relevant in interpreting intent of legislature and voters).

As the Secretary correctly points out in his response brief, the initiative right first appeared in the Nebraska Constitution in 1912 after the voters approved Senate File 1. (Filing 10 at 12). At that time, the state was governed by the Constitution of 1875, which established two processes for amending the constitution: either (1) calling a constitutional convention recommended by three-fifths of the legislature and confirmed by a majority of voters in the next general election cycle, or (2) passing legislation proposing a constitutional amendment in both legislative chambers, and

11

then placing the matter before the voters in the following general election. Neb. Const. of 1875, art. XVI, §§ 1–2.

Discussions regarding an initiative right began in 1911 with an address by both the outgoing governor, Ashton C. Shallenberger, and the incoming governor, Chester H. Aldrich. Governor Shallenberger provided an impassioned speech exalting the virtues of the initiative process as adopted in neighboring states:

> The initiative is designed to place in the hands of the people the power to make laws for themselves when legislatures through indifference or ulterior influences shall refuse to enact the legislation they desire. The initiative and referendum combined will insure popular government not so much because of laws that may be enacted under the right conferred in the proposed amendment but rather because of the latent power which the members of the legislature will know is in the possession of the people ready to be exercised whenever the house and senate shall fail to enact the laws demanded by them by the electorate of the state.

Message of Governor Ashton C. Shallenberger, 32nd Sess., S.J. 65, 82–88 (Neb. 1911); (Gutman Decl., Ex. A).

But Governor Shallenberger also addressed possible concerns associated with the ballot initiative process. Borrowing from experiences in other states, the Governor warned of the "submission of questions that should more properly be left to legislative action," and the possible "deluge of measures" that could "swamp matters of merit that otherwise might meet with popular approval." (Ex. A., p. 47). The Governor then discussed possible safeguards for these perceived problems, including increasing the number petitioners required for submission and limiting "the number of bills to be submitted at one election[.]" (*Id.* at 48).

12

**Never once, however, did Governor Shallenberger mention the multicounty distribution requirement as a possible solution to the perceived problems associated with the initiative process**. Thus, there is no indication from the early origins of the initiative process that the multicounty distribution was in any way integral to the passage. Rather, Governor Shallenberger spoke at length of the other provision of Article III—not challenged in this lawsuit— that requires signatures from 7 or 10 percent of registered voters. "I would recommend that the amendment to be adopted should require a petition of more than 10 percent of the electorate of the state to initiate legislation and not less than 8 percent of the same vote to invoke the referendum." (*Id*. at 50).

In fact, Governor Shallenberger explicitly condemned an initiative process that provided some voters more power than others. "To provide that minority and perhaps even a small minority of the voters of the state could change the fundamental law of the commonwealth, which even the supreme court itself is not allowed to disturb, would be dangerous in a vary marked degree, in my judgment." (*Id*. at 48).

Nor was the multicounty distribution requirement a source of discussion amongst the bicameral legislature. Indeed, the only record of any possible discussion of the multicounty distribution requirement is from Senator Varner, who explained his vote in favor of granting the right of initiative to the people. Senator Varner explained that while he was "still opposed to some of the provisions of the bill," and believed that it would "prove a greater burden than benefit" to the people of the state, he felt that "the people of right should be permitted to express themselves on matters of such great importance." (Gutman Decl. Ex. B. at 266). In other words, although it

13

appears that Senator Varner disagreed with the multicounty requirement, that perceived disagreement was not so integral as to warrant depriving the people of the initiative process entirely. (*See id*.)

As noted above, historical facts are relevant in interpreting the intent of the legislature and voters. *Duggan*, 249 Neb. at 430-31. Here, the historical facts in connection with the passage of the initiative process clearly weigh in favor of severability, as does the express text of the 1912 ballot. There is simply "nothing in the legislative history [that] demonstrates or even implies" that the multicounty distribution requirement "was critical" to the passage of Article III, Section 2 of the Constitution. *Big John's Billiards, Inc*., 288 Neb. at 952. Accordingly, the multicounty distribution requirement was not an inducement to the initiative power and is therefore severable.

### ii.   Violence to voter intent

Nebraska courts also consider whether severability will "do violence" to the intent of the people. *Jaksha*, 241 Neb. at 129. Based on the historical context discussed above, this factor clearly weighs in favor of the plaintiffs.

It is clear from the legislative history, the text of the 1912 ballot, and over a century of Supreme Court caselaw that the intent of Article III, Section 2 of the Nebraska Constitution is to reserve legislative power to the people of Nebraska. For this reason, the Nebraska Supreme Court demands that the power of initiative "be liberally construed to promote the democratic process." *Stewart v. Advanced Gaming Techs., Inc.*, 272 Neb. 471, 485, 723 N.W.2d 65, 77 (2006).

14

Against this backdrop, there is simply no valid argument that severing the unconstitutional multicounty requirement would "do violence" to the intent of voters who were not even presented with this language on the 1912 ballot. (Gutman Decl. Ex D). Nor would it do violence to a legislative body whose primary concern was to "place in the hands of the people the power to make laws for themselves when legislatures through indifference or ulterior influences . . . refuse to enact the legislature they desire." (Gutman Decl., Ex. A, pg. 46). This factor clearly weighs in favor of severability, and the Secretary's arguments should therefore be rejected.

### iii.    A workable and enforceable plan

Under the *Jashka* severability analysis, "the first and second factors examine whether, absent the invalid portion, a workable and independently enforceable plan remains." *Duggan*, 249 Neb. at 428.

The Secretary presents several doomsday scenarios in his brief if the Court ultimately invalidates the multicounty distribution requirement. In particular, he argues that election officials would be "burdened" if the Court were to lift the unconstitutional provision. (Filing 10 at 15). But this factor is not concerned with the possible burdens imposed on state employees—it focuses instead on whether an independent and workable plan remains. *Duggan*, 249 Neb. at 428. And the answer to *this* question is yes.

If the Court invalidates the unlawful multicounty distribution requirement, ballot sponsors must still comply with the other requirements of Article III, Section 2. In particular, statutory initiative sponsors must still obtain signatures from "seven

percent of the registered voters of the state[.]" NEB. CONST. art. III, § 2. And the Secretary provides no argument as to why this requirement, absent the multicounty distribution component, is not enforceable or workable.

The Secretary cannot provide a meaningful explanation on this point because several other states have the exact same requirement the Secretary deems unworkable. Specifically, the following states require an overall signature threshold without a multicounty distribution requirement: Arizona (Ariz. Const. art. I, § 1(2)); California (Cal. Const. art. II, § 8(b)); Maine (Me. Const. art. IV, Part Third, § 17(1)); Michigan (Mich. Const. art. II, § 9); North Dakota (N.D. Const. art. III, §§ 4, 9); Oklahoma (Okla. Const. art. V, § 2); Oregon (Or. Const. art. IV, § 1); South Dakota (S.D. Const. art. III, § 1); Washington (Wash. Const. art. II, § 1(a)).

Further, the parade of horribles advanced by the Secretary have not materialized in any of the various other states that have struck down the same, or similar, provisions under the Equal Protection Clause. *See Am. C.L. Union of Nevada v. Lomax*, 471 F.3d 1010, 1021 (9th Cir. 2006) (Arizona); *Idaho Coal. United For Bears*, 234 F. Supp. 2d at 1165; *Gallivan v. Walker*, 54 P.3d 1069, 1096, 2002 UT 89, ¶ 80 (Utah 2002) (Utah); *Blomquist v. Thomson*, 739 F.2d 525, 528 (10th Cir. 1984) (Wyoming); *Communist Party of Illinois v. State Bd. of Elections for State of Ill.*, 518 F.2d 517, 520 (7th Cir. 1975) (Illinois).

A workable and enforceable mechanism remains in place if the unconstitutional multicounty requirement is ultimately invalidated. Accordingly, this factor weighs in favor of severability.

### iv.    Severability clause

It is true, as the Secretary points out, that Article III does not contain a severability clause. But the presence or absence of a severability clause is not dispositive of the broader severability analysis. *Ewing*, 420 N.W.2d at 691 ("The presence of a severability clause in the statute is not essential to a ruling declaring that the offending portion of a statute severable."); *see also Hubbell Bank v. Bryan*, 124 Neb. 51, 245 N.W. 20, 24 (1932) ("We adopt the rule that a provision expressing legislative intent as to the separability of the various parts of a statute is an aid merely to judicial interpretation."). Thus, in light of the other factors set forth above, the absence of an express severability clause in a provision adopted over 100 years ago is irrelevant. To the extent the Court reaches the issue, the multicounty distribution requirement should be severed.

## II. Plaintiffs are likely to succeed on the merits.

Once a state confers upon its citizens the right to an initiative, "the state may not implement procedures to limit that state created right in contravention of the U.S. Constitution." *Dobrovolny v. Moore*, 936 F. Supp. 1536, 1541 (D. Neb. 1996); *see also Meyer v. Grant*, 486 U.S. 414, 423, 108 S. Ct. 1886, 1893, 100 L. Ed. 2d 425 (1988). Here, the multicounty distribution requirement contravenes the First and Fourteenth Amendments to the U.S. Constitution, and plaintiffs are likely to succeed on the merits of both claims.

## A.  Plaintiffs are likely to succeed on their Equal Protection Claim.

The Secretary's entire equal protection argument depends on the level of scrutiny applied. Although nearly every court to consider the matter holds otherwise,

17

the Secretary urges rational basis review. (Filing 10 at 18). This argument is premised on two primary factors: (1) the alleged distinction between candidates and ballot initiatives, and (2) footnote 4 in *Bernbeck v Gale*. (*Id*. at 18-23).

### 1. Strict scrutiny is the proper standard.

The Secretary concedes that the Supreme Court in *Moore v. Ogilvie* extended 'one person one vote' precedents to the petition context. 394 U.S. 814, 817 (1969). But the Secretary argues that *Moore* applies only to signatures on nominating petitions for candidates, not the "state-created right of initiative." (Filing 10 at 19). Stated another way, the Secretary sees a constitutional distinction between candidate discrimination and initiative discrimination.

But no such distinction exists. When a state chooses to grant the right to vote in a particular form, it subjects itself to the requirements of the Equal Protection Clause. *See Bush v. Gore*, 531 U.S. 98, 104, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000). This is true regardless of whether the state-created right involves the electors for President and Vice President, as was the case in *Moore*, or the right of initiative, as is the issue here. *See Idaho Coal. United for Bears*, 342 F.3d at 1077 n.7 (rejecting Idaho's argument that there is constitutional distinction "between candidates and initiatives"). In other words, both candidates and initiatives implicate state-created rights, and the Secretary has provided no argument as to why one category receives stronger protections than another.

The Utah Supreme Court's discussion of this issue in *Gallivan* is instructive. In rejecting the same arguments advanced by the Secretary here, the Utah Supreme

18

Court noted: "The only difference between the case of a petition to place a candidate on the ballot and the case of a petition to place an initiative on the ballot is that the first involves a person and the second involves an idea that possibly could become law." *Gallivan*, 54 P.3d at 1095, 2002 UT at ¶ 77. The voters' suffrage right, the Court continued, is fundamental "regardless of whether the voters are voting for candidates or initiatives." *Id.*; *see also Montana Pub. Int. Rsch. Grp. v. Johnson*, 361 F. Supp. 2d 1222, 1228 (D. Mont. 2005) (applying strict scrutiny in ballot initiative case invalidating multicounty distribution requirement).

In sum, the Secretary has correctly identified a factual distinction between nominating petitions on the one hand, and ballot initiatives on the other. But this *factual* distinction is not relevant to the *legal* analysis required under the Fourteenth Amendment. As noted above, state created rights are subject to the same level of federal constitutional protection regardless of whether they pertain to candidates or initiatives. *See Idaho Coal. United for Bears*, 342 F.3d at 1077 n. 7. Accordingly, the Secretary's argument that rational basis applies should be rejected.

### 2.  The challenged provision does not survive strict scrutiny.

The Secretary states in his briefing that the plaintiffs want this court to "rewrite Nebraska's constitution" by "penciling in a new signature distribution requirement based on congressional districts." (Filing 10 at 2). But that is not accurate, as the Secretary knows. Rather, Judge Van Pelt's observations regarding congressional districts is relevant to judicial scrutiny, not judicial preference. *Libertarian Party of Nebraska v. Beermann*, 598 F. Supp. 57, 63 (D. Neb. 1984).

19

Because strict scrutiny applies, the state must show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest. *Republican Party of Minn. v. White*, 416 F.3d 738, 749 (8th Cir. 2005). In this case, the Secretary has provided several alleged interests for the multicounty requirement, including (1) ensuring statewide support, (2) reducing the possibility of "localized" initiatives, (3) sustaining "active responsibility and participation" by citizens across the state (which is exactly the same as the first asserted interest), (4) spreading the signature verification process, (5) simplifying the ballot, and (6) timely verification (which is exactly the same as the fourth interest).

The Third Circuit's observations regarding state justifications for multicounty distribution requirements applies here: "[I]t is rarely, if ever, necessary to impose county-based signature-gathering requirements that significantly burden voting rights." *Const. Party of Pa. v. Cortes*, 877 F.3d 480, 485 (3d Cir. 2017). This is because other, more narrowly tailored, options exist to achieve each of the alleged interests described in the Secretary's briefing. That is where the option of congressional districts come into play: "requiring a minimum number of signatures to be gathered from different congressional districts serves the interest of requiring candidates to show support across different geographical areas but does not dilute anyone's voting power." *Id.*; *see Libertarian Party v. Bond*, 764 F.2d 538, 544 (8th Cir. 1985) (approving congressional districts as opposed to county units because federal districts are "virtually equal in population").

There is no question that the Secretary's purported interests in the multicounty distribution requirement could be achieved through less discriminatory means, like congressional districts. Accordingly, the Secretary has not, and cannot, satisfy strict scrutiny review. The plaintiffs are not asking the Court to change what the distribution requirement is, but rather noting alternatives—such as congressional districts—that show the multicounty distribution is not narrowly tailored. For this reason, the plaintiffs are likely to succeed on the merits of their Equal Protection claim, and an injunction should therefore issue.

### 3.  Footnote 4 of *Bernbeck v. Gale* is dicta.

As a final matter, the Secretary also criticizes the plaintiffs for citing *Gallivan v. Walker*, which is the Utah Supreme Court's decision invalidating (and severing) a nearly identical multicounty distribution provision under the Equal Protection Clause. According to the Secretary, this decision—which is still good law today—is "dicta." (Filing 10 at 20). But the Secretary's argument then proceeds almost entirely on footnote 4 of the Eighth Circuit's decision in *Bernbeck*, which is actually dicta. The Secretary's arguments are without merit and should be rejected as a matter of law.

Standing is a threshold inquiry that "eschews evaluation of the merits." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). Thus, when a case is dismissed for lack of Article III standing, evaluation of the merits is merely dicta. *See Coal. for Env't v. Volpe*, 504 F.2d 156, 168 (8th Cir. 1974). In *Bernbeck*, the appellate court dismissed the plaintiffs' case for lack of Article III standing, meaning any

discussion of the merits is without precedential effect. *Id.*; *Bernbeck v. Gale*, 829 F.3d 643, 655 (8th Cir. 2016).

Further, the footnote on which the Secretary relies is tethered to Bernbeck's constitutional interest in "placing an initiative on the ballot." 829 F.3d at 647. It has no applicability to the other interest asserted by Bernbeck—his interest as "a petition signer"—which the Eighth Circuit also did not address on the merits. *Id.* at 650. Therefore, the appellate court's reference to "rational basis" review has no applicability to the merits of this dispute. Strict scrutiny applies,[3] and the Secretary's arguments to the contrary should be rejected.

### B. Plaintiffs are likely to succeed on their First Amendment Claim.

The plaintiffs are also likely to succeed on their free speech claim. As pled in the Complaint, the plaintiffs do not contend that the multicounty distribution requirement would be an unconstitutional burden in every circumstance. But they do contend that it has imposed a severe burden on their right to communicate core political speech and obtain access to the ballot. Experience has taught the plaintiffs that successful ballot petitions have usually required at least $1 million in financial funding. (Moffat Declar. ¶¶ 15-17.)

State restrictions on political proposals to gain access to a ballot violate the First Amendment when they limit the number of proponents who can speak and the hours they can speak, thus lowering the overall quantum of speech. *See Meyer v.*

---

[3] Notably, plaintiffs' counsel in *Bernbeck* conceded and encouraged rational basis review at oral argument, which is likely why the cited footnote does not include any citations to cases applying strict scrutiny.

*Grant*, 486 U.S. 414, 422-23 (1988). Such restrictions limit the size of the audience the proponents can reach, thus limiting their ability to garner the necessary signatures and make the "matter the focus of statewide discussion." *Id.* at 423.

The Supreme Court has also held that a "restriction on the amount of money a person or group can spend on political communication during a campaign . . . necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 339 (2010) (internal quotations and citations omitted). In *Citizens United*, the regulations limiting a corporation's campaign expenditures were complex and failure to comply could result in criminal liability. Nonetheless, the regulations could be entirely avoided if a corporation created a PAC. *Id.* at 337-38. But this alternative means of political expression did not save the restriction because it imposed a spending and administrative burden to comply with the law. *Id.*

In sum, election laws need not be a restriction on speech in the "strict sense" if compliance with them is onerous enough to have a chilling effect on a proponent's core political speech. *See id.* at 335. Any restrictions on initiative and referendum rights violate the First Amendment's free speech guarantee when they "significantly inhibit communication with voters about proposed political change and are not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify restrictions." *Buckley v. American Constitutional*

23

*Law Foundation, Inc.*, 525 U.S. 182, 192 (1999) (invalidating restrictions that circulators be registered voters).

Here, the Secretary does not address the effects of the multicounty-distribution requirement on the plaintiffs' political expression and associational rights, nor explain why it is necessary. Instead, he argues that the challenged constitutional requirements do not implicate the plaintiffs' First Amendment rights at all. (Filing 10 at 36). This argument is premised on the Eighth Circuit's recent decision in *Miller v. Thurston*, 867 F.3d 727 (8th Cir. 2020).

In *Miller*, the appellate court upheld a requirement that citizens signing a ballot petition had to do so in the presence of a canvasser and the canvasser to complete a notarized affidavit that his procedure was followed. *Id.* at 737. Although the in-person signature requirement implicated the First Amendment, the court held that strict scrutiny did not apply because the plaintiffs' right to engage in political speech was not severely burdened. The court reasoned that statutory accommodations for disabled citizens would allow them to communicate with a canvasser using a phone or computer, and "in theory" allow the citizen to watch someone sign for them from a window. *Id.* at 739-40. The court stated that when strict scrutiny does not apply, the question is whether the requirement is reasonable, nondiscriminatory, and furthers an important regulatory interest. *Id.* at 740. It determined that requirement satisfied this standard because the state had a strong interest in preventing mistakes and duplicate signatures, thus protecting the integrity of the initiative process. *Id.*

24

Here, however, the plaintiffs' evidence shows that their rights to political expression and association are severely burdened because of the multicounty distribution requirement. In particular, the plaintiffs cannot concentrate their communication efforts in targeted areas, thereby diluting their message. (Eggers Declar., ¶¶ 15-17.)  Additionally, in rural counties, as soon as volunteers reach the five-percent threshold in a county, they must discontinue their efforts and spending there and concentrate on a different county, even if the campaign learns of opportunities to present their proposal where citizens would be supportive. (*Id.*, ¶¶ 18-19.) Thus, the multicounty-distribution requirement impermissibly burdens the plaintiffs' political speech and associational rights by forcing them to (1) divert volunteers away from heavily populated areas into more sparsely populated areas, and (2) remove volunteers (and resources) away from counties, regardless of size, once the arbitrary percentage requirement is satisfied.

As a final matter, regardless of the level of scrutiny applied, the Secretary's arguments should be rejected because he has not, and cannot, offer a permissible justification for a requirement that violates the plaintiffs' first amendment rights. The plaintiffs' motion for preliminary injunction should be granted.

### III. The plaintiffs will be irreparably harmed without an injunction.

The Secretary's final argument pertains to irreparable harm. He argues that the State—not the plaintiffs—will be irreparably harmed if the Court issues the requested injunction. (Filing 10 at 44). This argument is premised in large part on the *Purcell* principle, which instructs federal courts in some circumstances to maintain the status quo in the lead up to an election.

But the *Purcell* principle is not a wholesale prohibition on voting litigation anytime an election draws near. And that is particularly true here, where the plaintiffs' claims exist between *Bernbeck*, which requires sponsors to be far along in the signature collection process to establish Article III standing, and *Purcell*, which cautions against judicial involvement on the "eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207, 206 L. Ed. 2d 452 (2020). In other words, if *Purcell* prohibited judicial intervention in this case, then the multicounty distribution requirement could never be reviewed, which is not in the interest of justice. (And besides, the Secretary has not demonstrated a significant administrative burden associated with the invalidation of an unconstitutional multicounty distribution requirement).

Nor does the Secretary address any of the actual harms identified by the plaintiffs, which are actual and imminent. For example, once the deadline for submitting signatures comes and goes, without relief from the Court, the imminent injury to Crista Eggers as a registered voter will occur and be irreparable in damages. Same with NMM: without an immediate injunction, NMM cannot adequately plan, strategize and fundraise for the remaining weeks of signature gathering, which are the most important in qualifying for the ballot. Accordingly, this factor of the *Dataphase* analysis is satisfied, and an injunction should issue.

### CONCLUSION

For the foregoing reasons, Plaintiffs Crista Eggers and NMM respectfully request their motion for preliminary injunction be granted.

DATED this 3rd day of June, 2022.

BY:     */s/ Mindy Rush Chipman*
Mindy Rush Chipman, #24499
Jane Seu, #27452
ACLU of Nebraska
134 S. 13st St. #1010
Lincoln, NE 68508
(402) 476-8091
mrushchipman@aclunebraska.org
jseu@aclunebraska.org

and

*/s/ Daniel J. Gutman*
Daniel J. Gutman, #26039
Regina E. Schneider #22009
Law Office of Daniel Gutman
300 South 19th Street, Suite 312
Omaha, Nebraska 68102
(402) 319-8897
daniel@gutmanllc.com
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d)(3), the undersigned certifies that this brief complies with the word limits set forth in NECivR 7.1(d). This brief contains 6,727 words, including all text, caption, headings, footnotes, and quotations, using the word counting function of Microsoft Word 2010.

/s/ Daniel J. Gutman