IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CRISTA EGGERS and NMM, | |
| Plaintiffs, | 4:22-CV-3089 |
| vs. | PRELIMINARY INJUNCTION |
| ROBERT EVNEN, Nebraska Secretary of State, | |
| Defendant. | |

## I. INTRODUCTION

Under Nebraska law, a petitioner seeking to place an initiative on the ballot must collect valid signatures from at least five percent of the registered voters in at least 38 of Nebraska's 93 counties. The plaintiffs in this case argue, among other things, that the 38-county rule violates the Equal Protection Clause of the U.S. Constitution, because it gives more power to voters in rural counties than in urban counties. And it does.

The Secretary of State's arguments to the contrary have significant implications. The Secretary takes the position that the right of initiative—the "first power reserved by the people" under the state constitution—is not part of Nebraskans' fundamental right to vote. The Secretary argues that the State can, in fact, abridge that right so long as "there is any reasonably conceivable state of facts that could provide a rational basis for it." And the Nebraska Secretary of State and Nebraska Attorney General's Office take the position that the 38-county rule is inseverable from the general initiative power—in other words, if the 38-county rule treats voters differently, then the *entirety* of Nebraska's initiative and referendum process should be struck down. For the State to argue that the baby must go with the bathwater is eyebrow-raising.

The Court disagrees with the Secretary: The right of initiative is, the Court finds, a fundamental right that the citizens of Nebraska possess, so the State may not discriminate against them in their exercise of that right. And, the Court finds, the power of initiative can be effectively exercised without discrimination. The State of Nebraska is absolutely free to require a showing of statewide support for a ballot initiative—but it may not do so based on units of dramatically differing population, resulting in discrimination among voters. Accordingly, the Court will grant the plaintiffs' motion (filing 2) to enjoin the Secretary of State from enforcing the 38-county rule.

## II. BACKGROUND

The Nebraska Constitution provides that "[t]he first power reserved by the people is the initiative whereby laws may be enacted and constitutional amendments adopted by the people independently of the Legislature." Neb. Const. art. III, § 2. That power is "invoked by petition," requiring the proponent of an initiative to gather signatures from registered voters to place the proposed initiative on the general election ballot. *Id*.

A petition to enact a law needs signatures from seven percent of Nebraska's registered voters, and a petition to amend the state constitution requires signatures from ten percent of registered voters. *Id*. And, central to this dispute: "In all cases the registered voters signing such petition shall be so distributed as to include five percent of the registered voters of each of two-fifths of the counties of the state. . . ." *Id*. In other words, in addition to gathering the signatures of approximately 87,000 registered voters, proponents of an initiative must gather signatures from at least five percent of the registered voters in at least 38 of the 93 counties in Nebraska. *Id*.; *see* Nebraska Secretary of State, *2022 Eligible Voter Statistics: Statewide, June*

*2022*, https://sos.nebraska.gov/files/doc/elections/vrstats/2022VR/Statewide-June-2022.pdf.

The population differences among those counties are marked. Douglas County is the most populous, with 584,526 residents in the 2020 census, and also has the most registered voters with 357,489. *See id*.; University of Nebraska Omaha, *2020 Census in Nebraska: Counties, Population from 1860 to 2020*, https://www.unomaha.edu/college-of-public-affairs-and-community-service/center-for-public-affairs-research/documents/data-county-pop-1860-to-2020census.xlsx. The least populous is McPherson County, with 399 residents and 346 voters, although it still has a few more voters than Arthur County, with 434 residents but only 337 voters. *See id*. Even were a petitioner to focus attention on the 38 most populous counties, the 38th—Merrick County—has only 7,668 residents and 5,086 registered voters. *See id*.

Those disparities are the basis for this challenge brought by the plaintiffs, Crista Eggers and the organization she works for, NMM (also known as Nebraskans for Medical Marijuana). Filing 1 at 1-2. Eggers is a registered voter in Sarpy County (190,604 residents and 121,653 registered voters) and is also a paid contractor, volunteer, and sponsor of NMM. Filing 1 at 1-2. NMM has filed paperwork with the defendant, the Nebraska Secretary of State, to place two initiative petitions on the November 2022 general election ballot, both generally intended to legalize cannabis for medical purposes in Nebraska. *See* filing 1 at 2; filing 4-1 at 9-12, 15-19.[1] They are gathering signatures for

---

[1] The plaintiffs' filings occasionally refer to the proposals as "referendums." *E.g.* filing 1 at 6; filing 3 at 6. But initiatives and referendums are different: The power of "initiative" is the power to *propose* laws and constitutional amendments, while the power of "referendum" is the power to *approve or reject* actions already taken by the Legislature. *See* Neb. Const. art. III, § 1. The plaintiffs' proposals here are initiatives. *See* filing 4-1 at 9-12, 15-19.

submission before this year's deadline of July 7, 2022. (Signatures are due "not less than four months" before the general election, *see* art. III, § 2, which this year is November 8, 2022, *see* Neb. Rev. Stat. § 32-403.)

The plaintiffs allege that the 38-county rule violates the U.S. Constitution in two ways. First, they allege that the 38-county rule makes the signature and vote of a registered voter in a more populous county "less meaningful than the signature and vote of other Nebraska residents in more sparsely populated counties." Filing 1 at 10-11. This, they say, is a violation of Eggers' rights under the Equal Protection Clause. Filing 1 at 11. Second, the plaintiffs allege that the 38-county requirement forces petition circulators to curtail their efforts in more populous counties in order to obtain the required signatures from other counties, limiting the number of people they can reach and making it more difficult to get their proposals on the ballot. Filing 1 at 12. This, they say, violates their First Amendment rights. Filing 1 at 13.

The plaintiffs seek a declaration that the 38-county rule is unenforceable and a permanent injunction barring the Secretary from enforcing it. Filing 1 at 13. And, because the signature-gathering process is ongoing and their deadline is looming, they also want a preliminary injunction barring enforcement of the 38-county rule immediately. *See* filing 2. The Secretary disagrees. Filing 10 at 1. The Secretary also thinks that before doing anything, this Court should ask the Nebraska Supreme Court whether the 38-county rule is severable from the remainder of art. III, § 2. Filing 12.

## III. DISCUSSION

It's important to clarify, at the outset, that although Eggers is only one person, she's a plaintiff in two very different capacities. As a petition sponsor, Eggers and NMM are in the same position: They are working to get a particular initiative on the ballot, and their interests involve the difficulty and feasibility

of successfully getting that done. Eggers, however, is also registered to vote in Sarpy County—one of Nebraska's most populous counties. So, as a petition signatory, she's personally affected by the alleged dilution of the value of her signature. To somewhat oversimplify, then: Eggers (wearing her petition-circulating hat) and NMM are asserting First Amendment rights associated with promulgating their initiative petitions, but Eggers (wearing her "I Voted" sticker) is also asserting her Equal Protection rights as a registered voter.

## 1. STANDING

But before directly addressing the merits of the plaintiffs' claims, the Court must address the issue of standing, because the Secretary says the plaintiffs lack it. Filing 10 at 2. The Constitution gives federal courts the power to adjudicate only genuine "Cases" and "Controversies," U.S. Const., art. III, § 2, and that power includes the requirement that litigants have standing, *California v. Texas*, 141 S. Ct. 2104, 2113 (2021). To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but must also seek (3) a remedy that is likely to redress that injury. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021). It is redressability that the Secretary questions here. Filing 10 at 9-17.

### (a) Redressability

The Secretary's argument goes like this: The 38-county rule, the Secretary says, isn't severable from the remainder of art. III, § 2. As a result, according to the Secretary, if the 38-county rule is constitutionally defective, Nebraska's entire initiative process falls with it. But the plaintiffs support an initiative! So, the Secretary concludes, their injury isn't redressable—at least, not in the way they'd like, because they would end up killing the initiative

they're trying to support. *See* filing 10 at 9. For their part, the plaintiffs suggest that the Court need not consider severability at all: Instead, they say that severability is a "post-merits relief determination" that's appropriately weighed only after a determination that the challenged provision is actually unconstitutional. Filing 16 at 5.

Neither position is entirely persuasive. To begin with, the Secretary's reasoning is circular: He asks the Court to assume the unconstitutionality of the 38-county rule, and then determine based on that hypothesis whether it's severable from art. III, § 2 . . . all to work around to the conclusion that the Court didn't have jurisdiction to make any of those decisions in the first place. The Secretary is conflating standing with the merits of the plaintiffs' case.

Moreover, the Court is unpersuaded by the Secretary's suggestion that redressability is premised exclusively on the forms of relief specifically requested by the plaintiffs. *See* filing 10 at 9. The case he cites for that proposition—*Steel Co. v. Citizens for a Better Env't*—was different because in that case, the plaintiff alleged only past misconduct, not a continuing or imminent future injury. 523 U.S. 83, 108-09 (1998). And the Supreme Court was clear that if the plaintiff "had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm." *Id.* at 108. The same is true here: Whatever the plaintiffs may ultimately *get*, what they're *asking for* would remedy their alleged injury. Moreover, their retrospective injury—and their Equal Protection claim, at least, certainly suggests one—can be redressed even by a request for nominal damages. *See Uzuegbunam*, 141 S. Ct. at 801-02.

It's also obvious that the plaintiffs' Equal Protection claim is remediable regardless of whether the 38-county rule is severable. There are two remedial alternatives when a law benefits one class and excludes another from the

benefit—a court may either declare the law a nullity and deny its benefit to the previously favored class, or it may extend the benefit to the previously excluded class. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017). But the Constitution is silent as to how equality is accomplished. *Id*.

Ordinarily, extension rather than nullification is the proper course. *Id*. But the Court must ask what remedial course the lawmaker would have chosen had it been apprised of the constitutional infirmity. *Id*. at 1701. That question, as we will see later, is remarkably similar (if not identical) to the substantive question posed by severability. The point here, though, is that the Court is fully able to remedy any Equal Protection violation regardless of whether the 38-county rule is severable (even if it's not the remedy the plaintiffs want).

### (b) Certification to Nebraska Supreme Court

The Secretary has also suggested that the Court should certify the question of severability to the Nebraska Supreme Court. Filing 10 at 10. And the Secretary has filed a motion to that effect. Filing 12.

Under Neb. Rev. Stat. § 24-219, the Nebraska Supreme Court may answer questions of state law from the Court when the question (1) is determinative of the pending cause and (2) appears to have no controlling precedent in the decisions of the Supreme Court of Nebraska. Certification is not obligatory and the decision to certify a question of state law rests in the Court's discretion. *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974); *Packett v. Stenberg*, 969 F.2d 721, 726 (8th Cir. 1992); *see McKesson v. Doe*, 141 S. Ct. 48, 51 (2020). The state court then has absolute discretion to accept or reject the request for certification from the federal court. *Keller v. City of Fremont*, 790 N.W.2d 711, 789 (Neb. 2010).

When determining if certification is appropriate, a court may consider the closeness of the question, the lack of state precedent, conflicting public

- 7 -

policy aims the state is better suited to resolve, whether the case is primarily a federal case or brought into federal court through diversity, and the likelihood of a legal issue recurring. *Hatfield v. Bishop Clarkson Mem'l Hosp.*, 701 F.2d 1266, 1267-69 (8th Cir. 1983). A federal court should not certify a question when there is "no uncertain question of state law whose resolution might affect the pending federal claim." *Keller*, 280 Neb. at 789. State courts often decline to answer questions merely asking for advisory opinions. *Id.*

And here, given the preliminary nature of the case, that's exactly what the Court would be asking. The Court has a fair amount of confidence in its Equal Protection Clause analysis, but the only conclusion the Court can draw at this point is that the plaintiffs are *likely* to succeed on that claim—not that they have. The Secretary wants the Court to ask the Nebraska Supreme Court what *would* happen *if* the 38-county rule is ultimately stricken. That's not an appropriate question to certify, and the Court seriously doubts that the Nebraska Supreme Court would entertain it.

Nor, for the reasons explained above, is severability dispositive of the plaintiffs' federal claims. The injury the plaintiffs allege is redressable, even if they don't like one of the potential remedies. Severability might affect the remedy, but will not affect the merits of the claim itself. Nor is the Court faced with ultimately making a "nonconjectural determination," *see Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake, Minn.*, 771 F.2d 1153, 1157 n.2 (8th Cir. 1985)—while Nebraska courts have not addressed the severability of the 38-county rule in particular, the Nebraska Supreme Court has laid down clear guiding principles for determining severability issues, *see, e.g., Big John's Billiards, Inc. v. State*, 852 N.W.2d 727, 739 (Neb. 2014). And the undersigned is familiar with those principles. *E.g. Duggan v. Beermann*, 544 N.W.2d 68, 80 (Neb. 1996). Federal courts should not mechanically certify all difficult state

- 8 -

law questions, *Hatfield*, 679 F.2d at 1261 n.4, and federal courts have a duty to address matters of state law even if that law is unsettled, *Jung v. Gen. Cas. Co. of Wisc.*, 651 F.3d 796, 801 (8th Cir. 2011).

Because severability is a largely hypothetical (at this point) and nondispositive issue, and because there is a substantial body of state law to guide its on this issue, the Court will deny the Secretary's motion to certify a question on that issue to the Nebraska Supreme Court.

### (c) Ripeness of Severability

That said, the Court is also not convinced, as the plaintiffs suggest, that it can ignore the question of severability entirely. The Court understands the position the plaintiffs are in—the Secretary's argument essentially takes their initiative rights hostage in an attempt to secure the 38-county rule, and that puts the plaintiffs in something of a bind. But that doesn't mean the plaintiffs can avoid the severability issue. Even if severability is "generally a post-merits consideration," filing 16 at 5, their motion for a preliminary injunction asks the Court to preliminarily assess the merits. And because a preliminary injunction is "appropriate to grant intermediate relief of the same character as that which may be granted finally," *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945), the Court must at least consider the final relief that might be awarded in determining what preliminary relief is warranted.[2]

---

[2] The cases cited by the plaintiffs do not persuade the Court otherwise. Contrary to their description, the Tenth Circuit in *Petrella v. Brownback* didn't "vacate[] a preliminary injunction order reaching the issue of severability," filing 16 at 5, because consideration of severability was premature—rather, the Court of Appeals reversed an order dismissing the case for lack of standing after the district court essentially adopted the theory of redressability urged by the Secretary here, and failed to decide the underlying constitutional question in the first place. 697 F.3d 1285, 1296 (10th Cir. 2012). Consideration of severability

The Court will, therefore, explain why it believes the 38-county rule is severable, after explaining why it believes the plaintiffs are likely to succeed on their Equal Protection claim. That also means that the Secretary's standing argument fails on its merits: Even if the Secretary's reasoning held up, the premise of the argument is wrong: The 38-county rule is, in fact, severable.

## 2. PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy and the party seeking injunctive relief bears the burden of proving that the relevant factors weigh in their favor. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020). Plaintiffs seeking a preliminary injunction must establish four factors showing such relief is warranted: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

### (a) Likelihood of Success on the Merits

In deciding whether to grant a preliminary injunction, likelihood of success on the merits is the most significant factor. *Laclede Gas Co. v. St. Charles Cty.*, 713 F.3d 413, 419-20 (8th Cir. 2013). The absence of a likelihood

---

in that case was premature because the district court *hadn't* assessed the constitutionality of the challenged provision. *See id*. So, the Tenth Circuit directed the trial court to consider severability *after* weighing constitutionality, *see id*.—which is something the plaintiffs are asking the Court to do now, if preliminarily. And in *Scott v. Roberts*, the Eleventh Circuit acknowledged that considering severability at the preliminary injunction stage "*might* be premature," but the Court ultimately did so anyway. 612 F.3d 1279, 1297-98 (11th Cir. 2010) (emphasis supplied). This Court will do the same.

of success on the merits suggests that preliminary injunctive relief should be denied. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). And in a challenge to a federal statute, state statute, or other government action based on presumptively reasoned democratic processes, the movants must show they are likely to prevail on the merits. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013).

*(i) Equal Protection*

The plaintiffs' Equal Protection claim is premised on the Supreme Court's decision in *Moore v. Ogilvie*, 394 U.S. 814 (1969). An Illinois statute required that independent candidates for statewide office provide at least 25,000 signatures supporting their nomination, and "that included in the aggregate total of 25,000 signatures are the signatures of 200 qualified voters from each of at least 50 counties." *Id*. at 815. The Court found that system to be "out of line" with its line of "one person, one vote" decisions. *Id*. at 818. The Court explained:

> The use of nominating petitions by independents to obtain a place on the Illinois ballot is an integral part of her elective system. All procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote.

*Id*. The Court was unpersuaded by the argument that the law was intended to require statewide support for a new political venture:

> This law applies a rigid, arbitrary formula to sparsely settled counties    and    populous    counties    alike,    contrary    to    the

> constitutional theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.

*Id*. at 818-19. So, the Court concluded:

> Under this Illinois law the electorate in 49 of the counties which contain 93.4% of the registered voters may not form a new political party and place its candidates on the ballot. Yet 25,000 of the remaining 6.6% of registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office. This law thus discriminates against the residents of the populous counties of the State in favor of rural sections. It, therefore, lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.

*Id*. at 819.

The Court is hard-pressed to see a principled distinction between ballot access for a new political party and ballot access for a political initiative. After all, the initiative and referendum process is reserved in the state constitution—initiative is the "first power reserved by the people"—as a basic exercise of legislative authority. *See* Neb. Const. art. III, §§ 1-2. So, regulations on that process necessarily implicate the fundamental right to vote. *See Lemons v. Bradbury*, 538 F.3d 1098, 1103 (9th Cir. 2008). And as in *Moore*, the use of a petition to invoke the power of initiative is "an integral part of [Nebraska's] elective system." *See* 394 U.S. at 818.

Other courts have reached the same conclusion. In *Idaho Coal. United for Bears v. Cenarrusa*, the Ninth Circuit addressed a fundamentally indistinguishable Idaho law requiring an initiative petition to be signed by six percent of the qualified voters in at least half of the state's 44 counties. 342 F.3d 1073, 1074 (9th Cir. 2003). The Court of Appeals found *Moore* to be controlling, explaining that "[n]ominating petitions for candidates and for initiatives both implicate the fundamental right to vote, for the same reasons and in the same manner, and the burdens on both are subject to the same analysis under the Equal Protection Clause." *Id.* at 1077. And, the Court of Appeals said, under *Moore*, "strict scrutiny applies to state laws treating nomination signatures unequally on the basis of geography." *Id.*

Analyzing the Idaho law, the Court of Appeals found that

in the smallest county a "vote" may count where 61 others sign, whereas in the largest county it may require up to 18,054 other signatures before the individual's "vote" will count. Both the Idaho and the Illinois requirements violate the Equal Protection Clause, because they allocate equal power to counties of unequal population. Because some of Idaho's counties are far more heavily populated than others, an initiative that is popular primarily with voters in sparsely populated counties can reach the ballot with the support of many fewer voters than can an initiative that is popular primarily with voters in densely populated counties . . . . [T]he Idaho system violates equal protection because the few voters in a sparsely populated county have a power equal to the vastly larger number of voters who reside in a populous county. In short, an electoral system, here the system governing the people's right to place initiative measures on the ballot, may not be based on

treating unequal counties equally and making the electoral determination dependent on the support of numbers of counties rather than numbers of people.

*Id*. at 1078.

The same principles led the Court of Appeals in *ACLU v. Lomax* to invalidate Nevada's similar state constitutional provision requiring an initiative petition to be "proposed by a number of registered voters equal to 10 percent or more of the number of voters who voted at the last preceding general election in not less than 75 percent of the counties [or 13 of the 17 counties] in the state." 471 F.3d 1010, 1013 (9th Cir. 2006). The Court of Appeals noted that (as in Nebraska) county population was unevenly distributed, meaning that the Nevada constitution "favored residents of sparsely populated counties over residents of heavily populated counties." *Id*. at 1019. And, the Court of Appeals held,

an initiative qualification rule that requires a fixed percentage of petition signatures from a fixed percentage of counties in a state with a substantially uneven geographic distribution pattern, which favors residents of sparsely populated areas over residents of densely populated areas, violates the Equal Protection Clause of the Fourteenth Amendment.

*Id*. at 1020; *accord Mont. Pub. Int. Rsch. Grp. v. Johnson*, 361 F. Supp. 2d 1222 (D. Mont. 2005); *Gallivan v. Walker*, 54 P.3d 1069, 1088 (Utah 2002); *but see Mass. Pub. Int. Rsch. Grp. v. Sec'y of Com.*, 375 N.E.2d 1175, 1180-83 (Mass. 1978).

It is apparent, based on the population figures briefly summarized above, that the 38-county rule would run afoul of that holding—in other words, that if *Idaho Coal.* and cases in accord with it correctly articulate Equal Protection principles, then the 38-county rule is unconstitutional. And the Secretary really doesn't argue otherwise: Instead, the Secretary attacks that holding on several different fronts.

### a. Initiatives and the Fundamental Right to Vote

First, the Secretary questions whether the "fundamental right to vote" extends to "the very different circumstance of this case—signing petitions to exercise one's state-created right of initiative." Filing 10 at 19.[3] And the Court acknowledges authority for the proposition that initiatives are state-created rights not guaranteed by the U.S. Constitution. *E.g.*, *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210-11 (10th Cir. 2002). But the cases cited by the Secretary for that proposition, filing 10 at 19, arise in the context of alleged burdens on the right of initiative or referendum, *see Kendall v. Balcerzak*, 650 F.3d 515, 520 (4th Cir. 2011) (onerous signature-verification requirements); *Biddulph v. Mortham*, 89 F.3d 1491, 1493 (11th Cir. 1996) (exclusion from ballot based on non-compliance with technical requirements for substance and titles); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 296 (6th Cir. 1993) (signatures excluded based on technical failures to comply with

---

[3] It's not dispositive, but the Court notes that the consistent description of the right of initiative as "state-created" rests on the assumption that the power to make laws is inherent to the State, and only delegated to the people via initiative and referendum. But the Nebraska Constitution clearly rests on a contrary assumption—that the power to make laws is popular, and only vested in the Legislature as representatives of the people. Art. III, § 1 provides that the "people *reserve* for themselves" the powers of initiative and referendum. (Emphasis supplied.)

initiative law). They did *not* involve weighting signatures differently based on geography.[4] And, in fact, each case cited by the Secretary affirms that limitations on the initiative process should be *non-discriminatory*. *See Kendall, 650 F.3d at 524* ("a State may establish non-discriminatory and content-neutral limitations on any referendum or initiative procedure"); *Biddulph*, 89 F.3d at 1499 n.8 (were equal protection rights "directly burdened, strict scrutiny might indeed might apply); *Austin*, 994 F.2d at 297 ("the state may constitutionally place nondiscriminatory, content-neutral limitations on the plaintiffs' ability to initiate legislation").[5]

The Secretary's argument is superficially directed at signatures on an initiative petition, but substantively, it actually takes aim at the entire initiative process. The logical—even necessary—implication of the Secretary's reasoning is that the state can abridge the right of initiative however it likes. The Secretary's argument that the fundamental right to vote is not implicated

---

[4] The Court also notes that in *Evenwel v. Abbott*—a case not cited by the Secretary—the Supreme Court characterized the "one person, one vote" theory "in terms of equality of representation, not voter equality." 578 U.S. 54, 71 (2016). Semantically, that description doesn't apply well to an initiative petition. But the Court is not persuaded that "one person, one vote" loses its vitality just because an initiative process cuts out the middleman of an elected representative. Rather than thinking of initiative as being a representative-less process, it might make more sense to think of each petition-signer and voter as being their *own* representative in that process. And the fact remains that under the 38-county rule, (1) the Secretary is counting signatures to see whether an initiative gets on the ballot, and (2) some signatures count more than others. That means some petition-signers are *represented* more than others.

[5] In addition, as the *Idaho Coal.* court noted, the right ultimately at issue in *Moore* was the right to directly vote for Presidential electors—a right likewise not guaranteed by the Constitution, which had been delegated to Illinois citizens only by state law. 342 F.3d at 1077.

here because this is an initiative petition, not a representative election, is not cabined to signature-gathering: It would mean that to further the goal of guaranteeing rural or statewide support, an initiative could also be required to gain support from a certain number of counties in the general election. The Secretary's position would leave no legal basis to question a system in which an initiative could garner support from a majority of voters statewide, and overwhelming support from voters in populous counties, only to fail because of the objection of a handful of voters in less populous counties.

That cannot be the law. While the state may be free to impose restrictions—even onerous restrictions—on the path to the ballot for initiative petitions, the Court is not persuaded that vote dilution is any more acceptable in direct democracy than in representative democracy. "[C]itizen initiatives and direct democracy do, in fact, implicate the principle of representational equality." *Semple v. Griswold*, 934 F.3d 1134, 1141 (10th Cir. 2019). If anything, it seems like in the exercise of direct democracy, weighing each voter's participation equally would be more important, not less.

And the clear teaching of *Moore v. Ogilvie* is that the use of nominating petitions is an "integral part of the election process" that "must pass muster against the charges of discrimination." 394 U.S. at 818. In other words, if a discriminatory classification would be unacceptable when counting votes in the general election, the same classification is unacceptable when counting signatures on a nominating petition. "Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance," and "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the

government is itself a denial of equal protection of the laws in the most literal sense." *Romer v. Evans*, 517 U.S. 620, 633-34 (1996).

### b. Standard of Review

In a related argument, the Secretary contends that the Court should apply so-called rational basis review in this case, rather than strict scrutiny or the *Anderson/Burdick* balancing test.[6] Filing 10 at 23. He argues that "[c]ourts continue to apply traditional equal protection analysis rather than the *Anderson/Burdick* framework when assessing equal protection challenges to election requirements (including those governing an initiative or referendum process) that do not implicate the fundamental right to vote." Filing 10 at 23.

As detailed above, the Court is not persuaded that the 38-county rule does not implicate the right to vote, as explained in Supreme Court precedent. Whether that leads the Court to *Anderson/Burdick* presents more of a challenge. In some cases, *Anderson/Burdick* has been described as a framework for evaluating burdens on First Amendment rights. *See Miller v. Thurston*, 967 F.3d 727, 736 (8th Cir. 2020). But in others, *Anderson/Burdick* has been applied to Equal Protection claims premised on voting rights. *See Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020); *see also Daunt v. Benson*, 999 F.3d 299, 314 (6th Cir. 2021); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 235 & n.32 (5th Cir. 2020); *Tully v. Okeson*, 977 F.3d 608, 616 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2798 (2021); *Ariz.*

---

[6] *Anderson/Burdick* requires the Court to weigh an asserted injury to the right to vote against the precise interests put forward by the state as justifications for the burden, and apply more exacting scrutiny when the burden on the plaintiff's rights is more severe. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204-05 (2008) (Scalia, J., concurring) (citing *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983)).

*Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020); *Fish v. Schwab*, 957 F.3d 1105, 1122 (10th Cir.), *cert. denied,* 141 S. Ct. 965 (2020); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019); *Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 180 n.2 (4th Cir. 2017).

That said, even the Secretary's argument implicitly concedes that an Equal Protection claim *would* receive strict scrutiny if the fundamental right to vote *was* at issue. *See* filing 10 at 23-26. Strict scrutiny is appropriate when unequal treatment interferes with the exercise of a fundamental right like the right to vote. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). And that right can be denied by dilution just as effectively as by outright denial of the franchise. *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

Accordingly, the Supreme Court has explained:

> This Court has consistently held in a long series of cases, that in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it as practicable, as any other person's. We have applied this principle in congressional elections, state legislative elections, and local elections. The consistent theme of those decisions is that the right to vote in an election is protected by the United States Constitution against dilution or debasement.

*Hadley v. Junior Coll. Dist. of Metro. Kan. City, Mo.*, 397 U.S. 50, 54 (1970). And, the Court said, if "a court is asked to decide whether a State is required by the Constitution to give each qualified voter the same power in an election open to all, there is no discernible, valid reason why constitutional distinctions should be drawn on the basis of the purpose of the election." *Id*.

*Anderson/Burdick* gets the Court to the same place. Under that standard, "the first step is to decide whether a challenged law severely burdens the right to vote. Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe. Burdens are severe if they go beyond the merely inconvenient." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring). Vote dilution is more than an inconvenience—it's an insurmountable impediment to effective use of the franchise. And under *Anderson/Burdick*, where a statute imposes a severe burden on a plaintiff's rights, it must satisfy strict scrutiny—that is, it must be narrowly tailored and advance a compelling state interest. *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020); *Miller*, 967 F.3d at 736.[7]

### c. State Interests

The Secretary proffers a number of governmental interests that, he says, support the 38-county rule:

> (1) ensuring that initiatives reaching the ballot have a significant modicum of broad-based geographical support, (2) reducing the possibility that initiatives of a localized nature will be on the ballot, (3) sustaining active responsibility and participation in the initiative process by citizens throughout the State, (4) protecting the integrity and reliability of the initiative process by spreading

---

[7] The Court is aware than in *Mahan v. Howell*, the Supreme Court held that a rational-basis standard was appropriate when considering deviations from the "one person, one vote" principle in legislative redistricting. 410 U.S. 315, 325 (1973). But *Mahan*'s application of that standard presupposed "an honest and good faith effort" to comply with the Equal Protection Clause's requirement that state officials construct districts "as nearly of equal population as is practicable." *Id*. at 324-25. The 38-county rule is obviously not such an effort.

the signature verification process to many county election officials,
(5) simplifying the ballot, and (6) ensuring that the State can
timely review all the signatures filed in support of the submitted
initiatives.

Filing 10 at 27. None satisfy the government's burden.

(1) Geographical Support

The first proffered justification is the most important—because,
honestly, it's probably the one that the 38-county rule was *actually* intended to
serve. The Secretary argues that Nebraska has

a strong interest in requiring that initiatives demonstrate a
significant modicum of statewide support before appearing on the
ballot. Because initiative measures generally affect the entire
state, a representative portion of people from the whole state
should have a voice in putting the issues on the ballot. The
multicounty signature requirement directly furthers this interest
by preventing initiative sponsors from obtaining all the required
signatures from Omaha and Lincoln. It ensures that voters
throughout different parts of the State will be included in the
process.

Filing 10 at 28. Perhaps so. There may well be an "an important regulatory
interest in making sure that an initiative has sufficient grass roots support to
be placed on the ballot." *Angle v. Miller*, 673 F.3d 1122, 1135 (9th Cir. 2012)
(citing *Meyer v. Grant*, 486 U.S. 414, 425 (1988)). But the 38-county rule isn't
narrowly tailored to that objective.

To begin with, "[e]nsuring a modicum of statewide support for an initiative is not a *compelling* state interest." *Id*. at 1135 n.7; *see Lomax, 471 F.3d at 1021; Idaho Coal., 342 F.3d at 1078. Moore* itself was clear that it was "no answer to the argument under the Equal Protection Clause that this law was designed to require statewide support for launching a new political party rather than support from a few localities." 394 U.S. at 818. And even under a lesser standard, the state must show something more than a rational basis for inequality—"it must provide a reason or reasons that are strong enough to justify the significant dilution of its citizens' right to vote." *Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1285 (10th Cir. 2019).

The problem for the Secretary is that there are plenty of ways the state could ascertain the statewide support for an initiative petition without relying on units of dramatically differing populations. The plaintiffs suggest congressional districts (perhaps with a self-interested eye toward never having to leave the Omaha, Lincoln, or Grand Island metropolitan areas). But legislative districts would also be an option. Nebraska is full of population-apportioned district maps that could be turned to this purpose. And there's abundant authority for the proposition that the Equal Protection Clause permits the state to require a showing of geographically distributed support as part of the initiative process, so long as it treats petition signatories equally. *See Libertarian Party v. Bond*, 764 F.2d 538, 543 (8th Cir. 1985); *see also Semple*, 934 F.3d at 1141-42; *Angle*, 673 F.3d at 1135-36; *Count My Vote, Inc. v. Cox*, 452 P.3d 1109, 1115 (Utah 2019).

### (2) Reducing Localized Initiatives

The Secretary contends that the state has "an important interest in reducing the possibility that initiatives of a localized nature will be on the ballot." It's not clear what the difference is between that and the claimed

- 22 -

interest in ensuring some statewide support. "Localized nature" is just another way of saying "not statewide." And the same reasoning applies.

### (3) Statewide Responsibility and Participation

Third, the Secretary asserts that "the State has a vital interest in sustaining active responsibility and participation in the initiative process by citizens throughout the State." Filing 10 at 29. For the most part, that looks like yet another way of saying the same thing. To the extent it represents anything new, it's not clear to the Court how the 38-county rule uniquely serves it—there is no shortage of ways to spark civic engagement that do not involve vote dilution. (One of which might be to put an initiative on a statewide ballot where voters in every county will have to decide what they think about it.)

### (4) Election Integrity

Next, the Secretary relies on the state's interest in "protecting the integrity and reliability of the initiative process." Filing 10 at 29. And "it is true that a State indisputably has a compelling interest in preserving the integrity of its election process." *281 Care Comm. v. Arneson*, 766 F.3d 774, 786 (8th Cir. 2014) (cleaned up). But the 38-county rule's connection to election integrity is tenuous at best.

The argument goes like this: The 38-county rule requires petition circulators to collect at least some signatures from 38 different counties, meaning that at least 38 different county election offices will be involved in verifying those signatures. So, that spreads the work around, reducing the possibility that overworked election offices in populous counties will make mistakes, and "decreas[ing] the possibility of a few bad actors in one county distorting the entire process." Filing 10 at 30.

- 23 -

The possibility of overburdening election officials in more populated counties will be discussed below. As for "a few bad actors"—the Secretary has presented not even a whit of evidence that corruption in the signature verification process is a problem or is likely to be a problem. *See* filing 11-1. Nor is that suggestion consistent with the fact that, with or without the 38-county rule, petitioners still have to get signatures from about 87,000 registered voters, and to do that they have to go where the people are. The Secretary even *relies* on that fact in responding to the plaintiffs' First Amendment claim. Filing 10 at 40. If the Douglas County Election Commissioner was a bad apple—and again, the Court emphasizes that there's no evidence he is—then the election lacks integrity regardless of whether a few other election offices have to verify a few more signatures. Not only is the 38-county rule not narrowly tailored to the goal of election integrity—it's not tailored *at all* to that goal.

<u>(5) Simplifying the Ballot</u>

Next, the Secretary argues that the state has an interest in simplifying the ballot. Filing 10 at 30. And that, again, may be a legitimate governmental interest. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 196 (1986). But as with all of the Secretary's proffered justifications:

> Assuming that these are all valid purposes advanced by the geographic distribution requirement, they nonetheless cannot save that requirement, because these purposes could be advanced as effectively and efficiently by another system that *would* treat voters residing in different geographic areas equally. For example, most if not all of these objectives could be satisfied, even more

readily, by simply increasing the statewide percentage of signatures required.

*Idaho Coal.*, 342 F.3d at 1079.

<u>(6) Effectively Managing the Initiative Process</u>

Finally, the Secretary suggests that "[b]ecause the multicounty signature requirement spreads the verification duties throughout more counties, it helps the State timely accomplish the monumental task of verifying tens, if not hundreds, of thousands of signatures." Filing 10 at 31.

The Court is, to begin with, not persuaded that vote dilution can be justified because accounting for every registered voter equally would be more work for someone. Even if spreading a bit of the work around would "help" get the job done, the Secretary has offered nothing to suggest it wouldn't get done otherwise. And rightly so: The Court expects that the Secretary has confidence in Nebraska's local elections officials, as does the Court.

But the Secretary's argument also founders on the math. The signature breakdown for the 2020 medical marijuana petition is a good example: Out of 196,611 raw signatures, 147,298 came from Douglas, Lancaster, and Sarpy counties (by far Nebraska's most populous counties). Filing 11-1 at 11-13. Expand to the top 6 counties by population, and we get to 160,395 of the signatures. Filing 11-1 at 11. No other county produced more than 3,000. Filing 11-1 at 11-13. Only 16 counties produced more than 1,000 signatures. There's simply no reason to believe—and the Secretary's evidence doesn't really suggest—that the handful of counties already verifying over 80 percent of the submitted signatures couldn't have readily handled the few thousand more each of them might have received in the unlikely event that all of the other counties' signatures had been diverted.

d. Contrary Authority

The Secretary directs the Court to two cases suggesting the 38-county rule is acceptable: the Massachusetts Supreme Judicial Court's decision in *Mass. Pub. Int. Rsch. Grp.*, 375 N.E.2d 1175, and footnote 4 of Judge Beam's majority opinion in *Bernbeck v. Gale*, 829 F.3d 643, 648-49 n.4 (8th Cir. 2016).

The Massachusetts court's decision is on point—but it is obviously not binding, and the Court doesn't find it persuasive. It rests on two premises that the Court has already rejected: that an initiative petition is somehow a "lesser" form of democratic political representation, and that signature-gathering for ballot access isn't an integral part of the election system. *See Mass. Pub. Int. Rsch. Grp.*, 375 N.E.2d at 1182-83. *Idaho Coal.*, 342 F.3d 1073, and *Lomax*, 471 F.3d 1010, are the better-reasoned decisions.

*Bernbeck* would be binding authority, had the Court of Appeals decided the issue presented—but it didn't. In *Bernbeck*, Judge Bataillon had decided that the 38-county rule violated the Equal Protection clause, for many of the same reasons the Court has articulated here. *Bernbeck v. Gale*, 58 F. Supp. 3d 949, 958 (D. Neb. 2014), *vacated and remanded*, 829 F.3d 643. But the Court of Appeals found that the plaintiff in that case lacked standing, because he was neither a supporter of a specific petition nor had alleged that he was a registered voter. *Bernbeck*, 829 F.3d at 648-50.[8]

Because the dispositive finding was a lack of subject-matter jurisdiction, footnote 4's discussion of the plaintiff's Equal Protection claim was plainly non-binding dicta. *See Sanzone v. Mercy Health*, 954 F.3d 1031, 1039 (8th Cir. 2020); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 351 n.12 (2005). That said, footnote 4 is also unresponsive to the arguments presented here.

---

[8] Obviously, those aspects of standing are not at issue in this case, because Eggers has alleged and averred to both. Filing 1 at 1-2; filing 4-2 at 1.

Footnote 4 did suggest it was "virtually certain" that the plaintiff had failed to state an Equal Protection claim and that if he had, the "required rational basis analysis would have doomed any such claim." *Bernbeck*, 829 F.3d at 649 n.4. But the footnote did so based on a dismissive treatment of the "state-created, nonfundamental right to participate in initiatives and referenda"—and did so without citing, much less discussing, the Supreme Court's decision in *Moore* or any of its progeny. *See id*. Footnote 4 also assumed rational-basis review was appropriate without employing *Anderson/Burdick* or any other framework for determining the proper standard of review. Simply put, there is little in footnote 4 to indicate that it was based on a fully considered assessment of the arguments and authority marshaled by the plaintiffs in this case.

### e. Conclusion

To summarize: The Court finds that the plaintiffs are more likely than not to succeed on their Equal Protection claim. *Moore*, 394 U.S. 814, teaches that signature-gathering for ballot access is an integral part of the election process as susceptible to Equal Protection analysis as is voting in the general election. And the better-reasoned view is that the lawmaking powers of initiative and referendum, reserved to the citizens of Nebraska in its state constitution, are protected by their fundamental right to vote.

### *(ii) First Amendment*

The plaintiffs' First Amendment claim doesn't fare as well. The plaintiffs' argument here is more factual, premised less on the direct operation of the 38-county rule and more on the collateral consequences of requiring them, as petition supporters, to travel to smaller counties to gather signatures. They say that their "prior experience in attempting to comply with Nebraska's multicounty distribution requirement illustrates that the requirement is

onerous and nearly impossible to meet except for the wealthiest and financed sponsors." Filing 3 at 16. And, they say, they are forced to leave some counties and "move to other counties to collect signatures to attempt to meet the multicounty distribution requirement, quelling the political speech in the counties where [they] are already present." Filing 3 at 17.

But neither contention shows "any restriction on [the plaintiffs'] ability to circulate petitions or otherwise engage in political speech." *Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 676 (8th Cir. 2012). Nor have the plaintiffs "shown any burden on [their] ability to publicize [their] own views or to use [their] preferred language while collecting signatures." *Id*. at 677. And while the state may not discriminate among voters in the administration of the initiative process, the *existence* of that process is not guaranteed by the Constitution, but created by state law. *See Miller*, 967 F.3d at 737.

So, the Eighth Circuit has distinguished between initiative petition laws that only make the process difficult, and those that affect the communication of ideas associated with circulating petitions. *Id*. The latter implicates the First Amendment. *Id*. The former does not. And that is, to begin with, fatal to the plaintiffs' claim that their First Amendment rights are implicated by the burden of the 38-county rule.

> While the Nebraska provision may have made it difficult for appellants to plan their initiative campaign and efficiently allocate their resources, the difficulty of the process *alone* is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected.

*Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997) (emphasis supplied); *accord Wellwood v. Johnson*, 172 F.3d 1007, 1009 (8th Cir. 1999).

- 28 -

It's for that reason that the plaintiffs' reliance on *Meyer*, 486 U.S. 414, is misplaced. Filing 3 at 16. In *Meyer*, the Supreme Court struck down a state law banning the use of paid petition circulators, reasoning that petition-circulating was "core political speech" and the law limited the "number of voices" that could carry the petitioners' message, the hours they could speak, and the size of the audience they could reach. 485 U.S. at 422-23. *Meyer* does acknowledge that the ability to access the ballot may "reduce the total quantum of speech on a public issue" by "limiting [petitioners'] ability to make the matter the focus of statewide discussion." *Id*. at 423.

But while the 38-county rule might make it more difficult to get issues on the ballot, it doesn't infringe on the ability to circulate petitions or engage in political speech—and, "absent some showing that the initiative process substantially restricts political discussion, *Meyer* is inapplicable." *Dobrovolny*, 126 F.3d at 1113; *see MacMann v. Matthes*, 843 F.3d 770, 779 (8th Cir. 2016); *Wellwood*, 172 F.3d at 1009. In other words, as explained in *Dobrovolny*, raising the bar for ballot access doesn't implicate the First Amendment absent some more direct regulation of communication of ideas. *See* 126 F.3d at 1113; *see also Semple*, 934 F.3d at 1142. *Meyer*, the Eighth Circuit has said, involved laws that *directly* "limited the number of people who would be willing to circulate petitions, discouraged participation in an initiative campaign, and inevitably reduced the amount of speech available to proponents." *Missouri Roundtable for Life*, 676 F.3d at 675. *Meyer* "does not require us to subject a state's initiative process to strict scrutiny in order to ensure that the process be the most efficient or affordable." *Dobrovolny*, 126 F.3d at 1113.

Nor does it violate the First Amendment for a petitioner to have an incentive—even a powerful incentive—to redirect her efforts from some voters in one location to other voters in another location.

- 29 -

> The First Amendment permits states considerable leeway in regulating the electoral process, provided their choices do not produce undue hindrances to political conversations and the exchange of ideas. We believe this leeway applies to a state's decision about how to measure the grassroots support sufficient to qualify an initiative for the ballot. Some states may prefer a single, statewide signature requirement, while others may choose a signature requirement with a geographic component, restricting the initiative to proposals having a minimum level of statewide support, rather than only localized support.

*Angle*, 673 F.3d at 1135 (cleaned up). Leaving aside the Equal Protection problems with the state's proxy for measuring statewide support, it's reasonably clear that the First Amendment permits the state to impose *some* burden on petitioners to gather signatures from a variety of places across the state. Such a policy

> does not restrict one-on-one communication between petition circulators and voters. It neither limits the number of voices who will convey the initiative proponents' message, nor discourages participation in the petition circulation process. On the contrary, in terms of interactive communication between circulators and voters, the [geographic distribution requirement] likely *increases* the total quantum of speech on public issues, by requiring initiative proponents to carry their messages to voters in different parts of the state. The rule thus does not impose a severe burden on communication between circulators and voters.

*Angle*, 673 F.3d at 1132-33 (cleaned up).

In sum, the Court finds that the 38-county rule's indirect effects on petition circulators do not directly burden their First Amendment rights. The plaintiffs aren't more likely than not to succeed on their First Amendment claim. But because the plaintiffs need only establish a likelihood of succeeding on the merits of any one of their claims, the Court considers the remaining *Dataphase* factors. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019).

(b) Irreparable Harm

A preliminary injunction cannot issue without a showing of irreparable harm. *Dataphase*, 640 F.2d at 114 n.9. To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). Stated differently, the harm "must be actual and not theoretical." *Brady v. Nat'l Football League*, 640 F.3d 785, 794 (8th Cir. 2011).

There is little doubt about the plaintiffs' showing of irreparable harm. The Secretary really doesn't contest it: He simply asserts that the plaintiffs' arguments are contingent on the constitutional violation that, he says, the plaintiffs didn't show. Filing 10 at 43. The Court found that they did. "And at least when the constitutional right at issue is protected by the Fourteenth Amendment, the denial of that right is an irreparable harm." *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016).

In fact, the injuries the plaintiffs allege, "*i.e.*, deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M.*, 917 F.3d at 1003.

> And because the potential abridgment of Plaintiffs' constitutional rights stems from its effect on voting and associational rights in connection with an election, it is certainly irreparable in the sense that it cannot be adequately compensated post-election: Once the election occurs, there can be no do-over and no redress. The injury to these voters . . . is real and completely irreparable.

*Pavek v. Simon*, 467 F. Supp. 3d 718, 754 (D. Minn. 2020) (cleaned up). The Court finds an adequate showing of irreparable harm.

### (c) Balance of Harms and Public Interest

Because a preliminary injunction is an extraordinary remedy never awarded as of right, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Court must also weigh the public interest, but these factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 436 (2009). And where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and the state's administration of its own law. *Dixon v. City of St. Louis*, 950 F.3d 1052, 1056 (8th Cir. 2020). The Court also remains mindful of the movants' burden to demonstrate that an injunction is warranted, which is heavier when the preliminary injunction would, in effect, give the movants substantially the relief they would obtain after a trial on the merits. *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789-90 (8th Cir. 1989); *see Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993).

*(i) Public Interest in Enforcement of State Law*

The Secretary first refers the Court to the Eighth Circuit's pronouncement in *Org. for Black Struggle* that a state "suffer[s] irreparable harm" when it is "precluded from applying its duly enacted legislation regarding elected procedures." Filing 10 at 43 (quoting *Org. for Black Struggle*, 978 F.3d at 609). But the Secretary overlooks the rest of the paragraph, in which the Eighth Circuit repeatedly noted an important limitation on that principle: That the state is irreparably harmed *unless* its law is unconstitutional. *Org. for Black Struggle*, 978 F.3d at 609 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("[u]nless that statute is unconstitutional, this would seriously and irreparably harm the State")). That's because the public is also served by the preservation of constitutional rights. *D.M.*, 917 F.3d at 1004. The Court agrees with the Secretary that the state has a paramount interest in its "power to enact and enforce any laws *that do not conflict with federal law.*" Filing 10 at 43-44 (quoting *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022)) (emphasis supplied). But the Court has already discussed at length why the Court finds it more likely than not that the 38-county rule conflicts with federal law.

*(ii) Fair and Orderly Operation of Elections*

The Secretary also asserts that the state's "interest in the fair and orderly operation of elections," *see Org. for Black Struggle*, 978 F.3d at 609, is implicated here because "this lawsuit threatens to invalidate Nebraska's initiative right in its entirety" and "at least 16 total initiative or referendum measures (including Plaintiffs' two) are currently in circulation for the 2022 election." Filing 10 at 44. But for starters, the purported threat to Nebraska's initiative right "in its entirety" is illusory: That's entirely within the Court's control in crafting an equitable remedy, and will be dealt with below.

- 33 -

The Secretary's claim that the plaintiffs' "requested relief at this belated date threatens to send the whole initiative process into chaos," filing 10 at 44, is equally illusory. The Secretary's argument rests on the so-called *Purcell* principle, pursuant to which "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)); *see Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020); *Org. for Black Struggle*, 978 F.3d at 609; *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944-45 (2018).[9]

But this isn't the "eve" of an election, and the *Purcell* principle isn't implicated here. To start with, there's no bright line for how close is too close to an election to emend the rules, but the Eighth Circuit has said: "Although the Supreme Court sometimes frowns on changes in election procedure when they come too close to an election, there is no universal rule that forbids a stay after Labor Day." *Brakebill v. Jaeger*, 905 F.3d 553, 560 (8th Cir. 2018) (citation omitted). That certainly implies that an injunction after Memorial Day provides plenty of time.

The July 7 deadline for signature submission, and the need to finalize the ballot in advance of the election, do compress the timeline somewhat here. But the more important point is that substantively, the concerns addressed by *Purcell* simply aren't in play. *Purcell* requires the Court to weigh "considerations specific to election cases and its own institutional procedures," because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away

---

[9] The Secretary presents the *Purcell* principle and the public's "interest in the fair and orderly operation of elections" as if they're different considerations, filing 10 at 44, but at least on the arguments presented here, they're really the same.

from the polls," and "[a]s an election draws closer, that risk will increase." 549 U.S. at 4-5. Nothing about the 38-county rule—either its enforcement or enjoinment—risks confusing *voters*. The state's interests may also be threatened by changes that confuse election administrators. *See Democratic Nat'l Comm. v. Wisc. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). But that sort of confusion isn't a risk here either.

The Court absolutely acknowledges the important interests that *Purcell* is meant to protect. The state has an "extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

> When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Id*. at 880-81. But then the Court must ask whether "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id*. at 881.

And in this case, assuming enjoinment of the 38-county rule: Who would be confused? It doesn't make a difference to voters, who would be presented with a ballot just like any other election. There would be, for instance, no difference in polling place, or election procedure, or district boundaries. Same with local elections officials, whose tasks will be the same: Verify the petition

signatures provided by the Secretary of State, *see* Neb. Rev. Stat. § 32-1409, then administer the general election as always. Even petition circulators wouldn't *need* to know about the Court's order: They might miss an opportunity if an unnecessary attempt to satisfy the 38-county rule meant not gathering enough total signatures to get on the ballot, but there's also no reason they can't go about their business as always.[10]

As a practical matter, there's only one person in the state of Nebraska who *needs* to know whether the 38-county rule has been enjoined: the Secretary. And the only thing he needs to do is *not* reject a petition for failing to satisfy the 38-county rule *if* it satisfies all the other requirements to get on the ballot. The Court's quite confident that the Secretary and his capable staff can do that without throwing the state into chaos.[11]

*(iii) Timeliness of Plaintiffs' Filing*

Finally, the Secretary suggests that the plaintiffs didn't file suit quickly enough—that they filed their initial paperwork last September, but only filed this case in May. Filing 10 at 45. The Court isn't persuaded. True, when weighing the propriety of injunctive relief and the specific concerns raised by *Purcell*, it may be relevant whether a plaintiff has "unduly delayed bringing

---

[10] And perhaps every reason to do so. This is only a preliminary injunction, and there's a lot left to litigate. It wouldn't be prudent to count on the unenforceability of the 38-county rule only to find out otherwise later, if all bases could be covered by satisfying the rule anyway.

[11] Even assume the absolute, worst-case scenario the Court can think of: An initiative makes the ballot because of the Court's injunction—that is, it gets on the ballot despite not satisfying the 38-county rule—and is approved by voters, only to be undone if this Court or another court later determines that the 38-county rule is enforceable. That would be regrettable, but it's hardly unprecedented for an approved initiative to subsequently be invalidated. *See Duggan v. Beermann*, 544 N.W.2d 68, 71 (Neb. 1996).

the complaint to court." *Id*. But there's a difference between filing at the first possible moment and "wait[ing] until the last minute," filing 10 at 45, and this wasn't the last minute. There's no reason to believe that effective relief is no longer available, nor any other basis to find that the Secretary or the public have been prejudiced by any delay.

## (d) Conclusion

After carefully considering all the *Dataphase* factors, including the unique considerations relevant in the context of election law, the Court finds they weigh in favor of enjoining the 38-county rule. The plaintiffs are more likely than not to succeed on their Equal Protection claim, they will be irreparably harmed by continued enforcement of the 38-county rule, and the state's interest in enforcing its election laws is outweighed by an ongoing injury to constitutional rights.

## 3. SEVERABILITY

The scope of preliminary injunctive relief requires the Court to make a preliminary assessment of the severability of the 38-county rule from the rest of art. III, § 2. Whether one provision of a statute is severable from the remainder is a question of state law. *Leavitt v. Jane L.,* 518 U.S. 137, 139 (1996); *Cellco P'ship v. Hatch,* 431 F.3d 1077, 1083 (8th Cir. 2005).

But federal law is not irrelevant. In addressing challenges to state and local laws, the Eighth Circuit has cautioned that a federal court should not extend its invalidation of a law further than necessary to dispose of the case before it. *Ness v. City of Bloomington,* 11 F.4th 914, 924 (8th Cir. 2021). Sometimes a limited solution is not possible because it would entail quintessentially legislative work that the Constitution does not empower federal courts to undertake. *Sisney v. Kaemingk,* 15 F.4th 1181, 1194 (8th Cir.

2021), *cert. denied,* 142 S. Ct. 1454 (2022). But generally, when confronting a constitutional problem in a law, courts should limit the solution by enjoining enforcement of any problematic portions while leaving the remainder intact. *Id*. Accordingly, "[w]e prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006)

With those background principles in mind, the Court must apply the standards developed under Nebraska law for determining whether the 38-county rule is severable from the remainder of art. III, § 2. The general rule is that when part of an act is held unconstitutional, the remainder must likewise fail, unless the unconstitutional portion is severable from the remaining portions. *Big John's Billiards*, 852 N.W.2d at 739.

To determine whether an unconstitutional portion of a law may be severed, an appellate court considers (1) whether a workable scheme remains without the unconstitutional portion, (2) whether valid portions of the law can be enforced independently, (3) whether the invalid portion was the inducement to passage of the law, (4) whether severing the invalid portion will do violence to the intent of the lawmaker, and (5) whether the law contains a declaration of severability indicating that the bill would have been enacted even without the invalid portion. *See id.*

(a) Workability

The first two factors are appropriately considered together: whether art. III, § 2 is workable and its valid portions can be enforced without the 38-county rule. *See Big John's Billiards*, 852 N.W.2d at 740. Obviously, it is and they can.

The Secretary's argument to the contrary is that "the people created an initiative process ensuring some measure of broad-based geographical support and involvement" but "that will not exist if the multicounty requirement is

- 38 -

removed." Filing 10 at 14-15. That's just a truism—clearly, if the 38-county rule is removed, then the 38-county rule is removed. And the Secretary presents no reason to think that the other provisions of art. III, § 2—the overall signature requirement, the deadline for the petition, the resubmission bar, the single-subject rule, etc.—can't function perfectly well without the 38-county rule in their midst. Nor is there any reason to conclude that the overall intent of art. III, § 2—the power of initiative—isn't still entirely functional. And the entire statutory scheme, which establishes the procedures for initiative and referendum petitions, remains unaffected. *See* Neb. Rev. Stat. § 34-1401 *et seq.*

*Big John's Billiards* is instructive: There, the Nebraska Supreme Court considered whether an act prohibiting smoking in public places and workplaces could stand without an exemption for tobacco retail outlets. 852 N.W.2d at 733. The court found that it could, simply concluding that the statute was "workable and its valid portions can be enforced without the exemption for tobacco retail outlets" because "[s]evering the exemption would not do violence to the Legislature's intent of protecting the public health and welfare by limiting exposure to secondhand smoke." *Id.* at 740.

What's noteworthy is what the court didn't say: It *didn't* say severance wasn't workable because the Legislature "created a law ensuring [that people would be able to smoke in tobacco shops]" but "that will not exist if [the exemption for tobacco shops] is removed." *See* filing 10 at 14-15. Instead, severance was workable, because the rest of the law could be enforced and the overall intent of the law was still served. The same is true here. Most states, in fact, seem to get by with initiative laws lacking any geographic signature requirement, much less a county-based requirement. *See generally* John G. Matsusaka, *For the Many or the Few: The Initiative, Pub. Policy, and American*

*Democracy* 149-52 (2004); Joseph F. Zimmerman, *The Referendum: The People Decide Public Policy* 34-37 (2001).

(b) Inducement

The third and fourth factors ask the Court to consider whether the unconstitutional portion of art. III, § 2 was such an inducement that the constitutional portions would not have passed without it. *Duggan*, 544 N.W.2d at 79. The test asks whether the enactment only passed because it contained the unconstitutional provision: Was the enactment approved because, and *only* because, the 38-county rule was included? *See Big John's Billiards*, 852 N.W.2d at 739; *State ex rel. Douglas v. Sporhase*, 329 N.W.2d 855, 856–57 (Neb. 1983); *Linn v. Linn*, 286 N.W.2d 765, 769 (Neb. 1980); *see also Jones v. Gale*, 470 F.3d 1261, 1271 (8th Cir. 2006).

As background, it's important to note the preeminent importance of the power of initiative in Nebraska law. It's been repeatedly stated

> that the power of initiative must be liberally construed to promote the democratic process, that the right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter, and that the provisions authorizing the initiative should be construed in such a manner that the legislative power reserved in the people is effectual.

*Hargesheimer v. Gale*, 881 N.W.2d 589, 597 (Neb. 2016); *accord, e.g.*, *Chaney v. Evnen*, 949 N.W.2d 761, 770 (Neb. 2020); *State ex rel. McNally v. Evnen*, 948 N.W.2d 463, 480 (Neb. 2020); *Christensen v. Gale*, 917 N.W.2d 145, 153 (Neb. 2018); *Stewart v. Advanced Gaming Techs., Inc.*, 723 N.W.2d 65, 77 (Neb.

2006). Nebraska is illustrative of the fact that "[i]n the western United States, direct democracy has become deeply embedded in the political culture of the region." *See* Thomas Goebel, *A Government by the People: Direct Democracy in America* 2 (2002). It is difficult even at the starting point to imagine that Nebraskans would have rejected that paramount right.

And the historical record bears that out. The Court "may use historical or operative facts in connection with the adoption of a constitutional amendment in order to interpret the meaning of the language of the Constitution." *Duggan*, 544 N.W.2d at 80.

> The movement to establish direct legislation in Nebraska started out as it had in several other states: as a Populist-endorsed idea, championed by a small but energetic group of advocates and supported occasionally by a marginalized Democratic Party and an assortment of minor third parties. The Populists and Democrats added the initiative and referendum to their platform for the first time in 1894. The Nationalist, Socialist-Labor, and Prohibition Parties joined them two years later. Opposition to the proposed reforms came primarily from the state's Republicans, who dismissed the ideas as socialistic experimentation and argued that their adoption would lead to the destruction of the Constitution.

Steven L. Piott, *Giving Voters a Voice: The Origins of the Initiative and Referendum in America* 242 (2003). But by 1911, the Legislature was Democratically controlled. *Id*. at 247. And the Republican Party, frustrated by their inability to enact temperance measures, had began to turn to direct legislation as a potential way around what they saw as liquor lobby influence in the Legislature. *See id*. at 244-48; *see also* Robert W. Cherny, *Populism,*

*Progressivism, and the Transformation of Nebraska Politics* 110 (1981). So the stars aligned for the initiative and referendum, with support from Populists, Democrats (including William Jennings Bryan), and Republican progressives. *See* Cherny, *supra*, at 159-60; Piott, *supra*, at 246-47. In the 1910 political campaign, planks favoring the initiative and referendum had been adopted by the Democratic and Republican state conventions, setting the stage for the 1911 legislative session. Piott, *supra*, at 247.

Supporters of direct legislation were disappointed by the 38-county rule. *Id*. at 247-48. But neither the plaintiffs nor the Secretary can point to much in the legislative history about it. That history is complicated here by the fact that art III, § 2 was put on the ballot by the Legislature and then approved by the voters. The Nebraska Supreme Court acknowledged, in the context of a constitutional amendment that was adopted by initiative, that determining intent can be a challenge: "The intent of a majority of state senators leaving a written record is far different from the intent of hundreds of thousands of individual voters." *Duggan*, 544 N.W.2d at 79. And in this instance, the Court is faced with both, neither of which speaks much to the point.

That silence, though, is meaningful. Start with the legislative record. The plaintiffs note that the only *possible* mention in the legislative record of the 38-county rule came from a senator who didn't like the overall proposal, but was willing to hold his nose and vote for the whole thing anyway. *See* filing 16 at 13; filing 17-3 at 8. And honestly, even that excerpt is too vague to speak to the point. *See* filing 17-3 at 8. Perhaps the 38-county rule was included as some sort of compromise, but both of the major political parties had already endorsed an initiative amendment generally, and there's nothing to suggest that the Legislature was able to approve the measure only because it contained the 38-county rule. *See Big John's Billiards*, 852 N.W.2d at 739. The point is

that if the 38-county rule was really what induced the Legislature to put the entire measure on the ballot, it should at least have merited a mention. The fact that it didn't even come up is something akin to the dog that didn't bark.

The electoral record doesn't provide much more. The plaintiffs point to the 1912 ballot, which didn't even mention the 38-county rule. Filing 17-5. The Secretary notes, however, that the failure to mention that aspect of the amendment on the ballot is hardly dispositive: At least some well-informed voters were certainly aware of it anyway, and Nebraska law provided for proposed constitutional amendments to be regularly published in the newspaper for three months preceding the election. *See* filing 22-1 at 3-4. Despite that publicity, though, the Secretary hasn't directed the Court to anything suggesting that the 38-county rule was a selling point for the proposal—and if it was, one would expect there to be evidence of the sale. The Secretary doesn't have the receipts here.

But the most important point is that the proposed amendment was adopted by a vote of 189,200 to 15,315. Filing 16 at 10; Piott, *supra*, at 248. The large majority can be explained in part by the fact that the ballot permitted voters to summarily vote a "straight" party-line ticket, and constitutional amendments were on the ballot in the same column as candidates, so they received all straight party-line votes unless a voter deliberately voted against the amendment. Piott, *supra*, at 248 n.37. And, of course, it was supported by all the major political parties and movements in Nebraska at the time. *See id*.

The numbers are worth repeating: The proposed amendment was adopted by a vote of 189,200 to 15,315. That's a landslide of genuinely epic proportions. There's absolutely nothing in the record to persuade the Court that in the absence of the 38-county rule, 86,943 voters would have changed their minds. The question for the Court is whether the voters would have

preferred what is left of art. III, § 2 to no initiative provision at all. *See Ayotte,* 546 U.S. at 330; *see also Duggan,* 544 N.W.2d at 80-81. It's evident they would. The Secretary simply asserts that "there is every reason to believe that the voters, especially those living outside Nebraska's few large cities, would not have approved an initiative power without the multicounty signature requirement." Filing 10 at 14. But there's really no reason to believe that, much less any reason actually supported by the record.

### (c) Severability Clause

Finally, the Secretary notes the absence of an express severability clause in art. III, § 2. And the Secretary even notes that the 38-county rule has appeared in the state constitution's initiative provision since it was adopted, "embedded into the same sentence" as the overall signature requirement. Filing 10 at 12, 15. But the fact that the 38-county rule has a long tradition of existence is not particularly helpful standing alone, nor is the Court persuaded to read too much into the sentence structure of the amendment: It's not insensible for different signature rules to be placed together, and lawyers have always used long sentences.

The absence of a severability provision is not irrelevant. But a severability clause isn't a condition precedent to a determination of the question of severability—a severability clause is merely an aid to construction, not an inexorable command. *Chase v. Douglas Cnty.,* 241 N.W.2d 334, 342 (Neb. 1976). The presumption against severability in the absence of a severability clause is weak, and severability is appropriate where the unconstitutional portion of a law can be separated and the valid parts would have passed even without the invalid part. *Id.* The "cardinal principle" is "to save and not destroy." *Id.* (quoting *Tilton v. Richardson,* 403 U.S. 672, 684 (1971)). And as explained above, there is nothing to suggest that either the

- 44 -

Legislature or the voters considered the 38-county rule essential to the enactment as a whole, nor any basis for assuming that the enactment would have failed without that provision, nor will excising it impair the operation of art. III, § 2 in any respect. *See Tilton*, 403 U.S. at 684.

## IV. CONCLUSION

In sum: The plaintiffs are more likely than not to succeed on their Equal Protection claim and will be irreparably harmed by continued enforcement of the 38-county rule, the state's interest in enforcing its election laws is outweighed by the ongoing injury to constitutional rights, and the 38-county rule is severable from art. III, § 2. Accordingly, it is appropriate for the Court to enjoin enforcement of the 38-county rule.

IT IS ORDERED:

1.     The plaintiffs' motion for preliminary injunction (filing 2) is granted.

2.     The Secretary of State's motion for a certified question (filing 12) is denied.

3.     The State of Nebraska, through the Secretary of State, is enjoined from taking any action to enforce its county distribution requirement for the qualification of proposed ballot initiatives, as set forth in Neb. Const. art. III, § 2, and no initiative petition shall be rejected solely because of its failure to gain signatures from "five percent of the registered voters of each of two-fifths of the counties of the state."

4:22-cv-03089-JMG-MDN   Doc # 23   Filed: 06/13/22   Page 46 of 46 - Page ID # 335

4.    The Secretary shall answer or otherwise respond to the
      plaintiffs' complaint on or before June 27, 2022.

Dated this 13th day of June, 2022.

BY THE COURT:

_____
John M. Gerrard
United States District Judge
